IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RECEIVED

JAN - 7 2002

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| ELVIRA SISTO, | ) | |
| Plaintiff | ) | |
| | ) | |
| V. | ) | CASE NO. 01 C 8262 |
| | ) | |
| | ) | U. S. DISTRICT JUDGE |
| SBC/AMERITECH, SEDGWICK | ) | WILLIAM T. HART |
| JAMES OF ILLINOIS, AS | ) | |
| AGENT AND ADJUSTING CO., | ) | U. S. MAGISTRATE JUDGE MASON |
| FOR SBC/AMERITECH, AND | ) | |
| INDIVIDUALLLY, AND THE | ) | Jury Demand |
| ILLINOIS BROTHERHOOD OF | ) | |
| ELECTRICAL WORKERS, LOCAL | ) | |
| # 21, as Consolidated, | ) | |
| Defendants | ) | |

FILED

DOCKETED          JAN 9 - 2001

JAN 1 4 2002    WILLIAM T. HART, JUDGE
UNITED STATES DISTRICT COURT

AMENDED COMPLAINT

Now comes Plaintiff, Elvira Sisto, (hereinafter referred to
as "Sisto") by and through her attorney, Stuart H. Galesburg,
and complains of Defendants, SBC/Ameritech, (hereinafter re-
ferred to as SBC), SEDGWICK JAMES OF ILLINOIS, as Agent, and
Ajusting Co. for SBC., and Individually, (hereinafter referred
to as "Sedgwick"), and the Illinois Brotherhood of Electrical
Workers, Local # 21, as Consolidated, (hereinafter referred to
as "IBEW") and complains against the Defendants as follows:

Jurisdiction

This Court has original jurisdiction pursuant to 28 U. S.
C. Sec. 1331, 29 U. S. C. 1132, (ERISA) and 29 U. S. C. 158 (a),
(b), Sec. 301 of the Labor Relations Management Act.

Venue

Venue is proper pursuant to 29 U. S. C 1391 (b) in that
SBC is a corporate resident of Cook County, Illinois. SEDGWICK
is a corporate resident doing business at SBC, Cook County,
Illinois, among other locations in the Northern District of
Illinois, IBEW is a Union, or labor organization, located in
Downers Grove, Illinois, County of DuPage, State of Illinois.

-2-

SISTO since the filing of the original state court declaratory
action, is now a resident of Las Vegas, Nevada. The complained
wrongdoing alleged, has all ocurred within the Northern District
of Illinois, Eastern Division.

COUNT I - E. R. I. S. A.

1. Plaintiff, Sisto, a 51 year old female, is a resi-
dent of the City of Las Vegas, State of Nevada;

2. Defendant SBC operates one of its telephone businesses
at 2401 W. Grace, Chicago, Illinois, County of Cook, State of
Illinois, where Sisto was an employee, prior to 10-27-99, on,
after that date;

3. SBC has subcontracted with Sedgwick to administer and
adjust, (with Sedgwick employees, using SBC stationery, and
identifying themselves as SBC employees. to SBC injured employ-
ees), SBC's workers compensation claims, including temporary
total disability and medical benefits, Short Term and Long Term
Disability Benefits, and Sedgwick reports all their daily and
monthly activities, including reserves on claims, to SBC Human
Resources, and to the SBC Risk Department, and work and health
status of each SBC employee;

4. Sisto was employed by SBC, at the Grace address, working
as a customer service representative, prior to, on October 27,
1999, thereafter, until SBC records reflect, by May 23, 2001,
letter advising that SBC will be terminating her on August 5,
2001, since "your Short Term Disability Benefits expire 8/5/01"
..."Under the provisions of the plan, your employment with
Ameritech will also end on that date." (See Exh. 1)

5.Said letter was authored on SBC stationery, by Ms. Debbie
Reeder, Manager of Long Term Disability, and employed by Sedgwick
to adjust Sisto's LTD, and any other beneifts she is entitled;

-3-

6. The May 23, 2001, letter goes on to set forth further obligations and benefits for Ms. Sisto as follows:

> a) "...To be eligible for LTD benefits, a physician must provide objective medical evidence which supports an inability to work."
> b) "...amounts payable to you under Social Security Disability or Retirement, Disability Pension and Worker's Compensation and that you are responsible for any overpayment made to you under the LTD Plan."
> c) "...To be eligible for LTD benefits, you must be totally disabled as defined by your Long Term Disability Plan." (See Exh. 1, Page 1, Pars. 1, 5, 6 and 7)

7. On 10-27-99, Sisto sustained a severe fall in the women's washroom with water on the floor, at the 2401 W. Grace, Chicago, Illinois, location, sustaining severe injuries, including but not limited to two herniated cervical discs, two herni= iated thoracic discs, and aggravations to a lumbar disc with radiation of pain down her lower extemity from the low back, with lack of mobility of her body due to chronic back pain, obesity, aggravating pre-existing diabetis, and hypothyroidism;

8. Sisto's daughter was called, who picked her up from work, that day, and was seen by Christopher Serpico, M. D., who filled out an SBC first report of injury, dated 10-27-99; (Exh. 2)

9. Sisto was off work for the balance of 1999, and received an SBC letter, dated November 1, 1999, accepting her claim for workers compensation benefits, but stating, she was not eligible for benefits, under the "Ameritech Sickness and Accident Disability Plan." (Exh. 3)

10. Sisto returned to her regular work on or about the first week of January, 2000, in chronic pain of the entire back, while undergoing physical therapy and, taking various prescribed medications;

11. Because of the severe pain, Sisto's last day of work was

-4-

inpatient at Ressurection Hospital in Chicago, Illinois, and dis-
charged on or about, August 10, 2000, where she was seen and
treated and examined by specialty physicians for her entire
back, diabetis, obesity, and thyroidism;

12. Sisto was prescribed approximately 15 different medica-
tions for her multiple conditions of ill-being, and spent most of
her day and night in bed with chronic and severe pains in the
entire back;

13. Una Brazel, R. N., an employee of Sedgwick, but adjusting
Sisto's worker's compensation claim, in-house for SBC, was only
allowing half salary to Ms. Sisto, which forced her to retain an
attorney to represent Sisto in her worker's compensation claim;

14. Counsel for Sisto, and Ms. Brazel, agreed that a R. N.
be assigned and retained by SBC, through Sedgwick, to make sure
that Sisto was getting the best care available, with the proper
diagnoses and treatment for her conditions of ill-being;

15. Ms. Brazel retained the services of Betty Gulersarian,
R. N., who visited Sisto at her home with Sisto's attorney, and
it was mutually agreed that Sisto get additional medical opinions
from orthopedists, neurologists, and neurosurgeons, located at
downtown Chicago hospital staff physicians;

16. This was accomplished with Ms. Gulersarian, counsel and
Sisto, attending examinations, objective tests ordered, and
findings that her entire back problems were related to her fall
at work on 10-27-1999, and Sisto was placed on workers compen-
sation benefits in late 2000, retroactive, to 7-31-00, by Ms.
Brazel, and continued through November 15, 2001, her last pay-
ment authorized by Sedgwick under workers compensation benefits;

17. Ms. Gulersarian would create narrative medical rehabili-
tation progress reports, on a monthy basis, sent to Ms. Brazell,

at Sedgwick, for SBC, advising that her entire back problem,
diabetis, obesity, and hypothyroidism, are related to her fall
at work on 10-27-1999;

18. On May 1, 2001, orthopedist, Giri Gireesian, provided
the new successor Sedgwick adjuster, a narrative report, advising
that Sisto was a candidate for "anterior cervical disectomy" and
interbody fusion, and that her conditions were work related to
her fall and she was to remain off work; (Exh. 4)

19. When Ms. Reeder wrote the May 23, 2001 letter, advising
Sisto, that her Short Term Disability Benifits would expire on
8-5-01, (however, Reeder, knew or should have known Sisto was on
workers compensation benefits and not short term disability
benefits) and that the Plan called for her termination, she
knew or should have known based on the medical information she
possessed, and the medical information provided by the retained
Rehabilitaion nurse, that Sisto would not be able to return to
any work by August 5, 2001, due to her severely handicapped and
disabled condition, whereby SBC contemplated as early as May 23,
2001, that Sisto would be terminated, but failed to advise
Sisto's IBEW union, or her steward, of SBC's plans to terminate
her, violating the collective bargaining agreement, between SBC
and IBEW Local 21, as required in Labor-Management Agreement,
between the Defendants, in effect from 6-28-98 through 6-28-03,
Article 13, Problem Resolution Procedures, Sec. 13.02; (Exh. 5)

20. On June 24, 2001, counsel for Ms. Sisto, wrote a two
page letter attempting to clarify Ms. Reeder's position set
forth in her May 23, 2001 letter, and sought legal authority,
and correction for mistatement of short term disability and
basis of Sisto's planned termination on 8-5-01, with no re-
sponse, nor requested plan booklets to advise Ms. Sisto of her

-6-

contractual rights, as Sisto requested the appropiate Plan book-
lets, numerous times from SBC-Human Resources, Sedgwick, through
Nina Bradley, a Sedgwick employee, who was adjusting the LTD
claim for SBC, for Ms. Sisto, and requested continued help from
Local 21, IBEW, with no responses;

21. Sisto retained attorney, Frank Soto, who tried to
prevent Ms. Sisto, from being terminated on 8-5-01, as she
received no requested assistance from SBC, or Local 21, IBEW;

22. Mr. Soto struck a negotiated deal with Ms. Bradley that
if he obtained a letter from one of Sisto's physicians, that
Sisto could not work, or even work in a similar or lesser
position for SBC, that Ms. Bradley would not have her termin-
ated;

23. Elizabeth Wallner, Sisto's treating internist, who re-
ferred Sisto to Dr. Gireesian, sent Ms. Bradley a narrative
report, dated 8-8-01, setting forth severe physical limitations
of no more than an hour of sitting, or writing; (Exh 7)

24. On September 6, 2001, Sisto learned by a telephone con-
versation, with Ms. Bradley, that she was terminated as of
8-5-01, based on the May 23, 2001 letter, and COBRA letters
were sent to Sisto, dated August 31, 2001, and that Dr.
Wallner's letter meant nothing;

25. Ms. Reeder, Ms. Bradley, Ms. Brazel, Ms. Duffy, were
Sedgwick employees adjusting workers compensation and LTD,
claims for Sisto, and other SBC employees and had hard copy and
computer quick access to all of Sisto's status on medical con-
dition and payment of workers compensation benefits, all in the
same office locality, at SBC, at all relevant times herein;

26. Ms. Bradley, per narrative letter, dated September 14,
2001, declined LTD to Sisto as not eligible, based on medical

documentation, which was not accurate, a statement that Sisto was to attend functional capacity tests, and page one of the 9-14-01 letter that states in the indented paragraph, that SBC's LTD Plan is not for injuries, that result because of an on the job injury; (Exh. 8)

27. Michelle Muellner, M. D., a pain management doctor at the Rehabilitation Institute of Chicago, in a letter dated April 4, 2001, advised Sisto's counsel and copied the SBC rehab nurse, Gulersarian, that Sisto was not to attend any evaluations, until she obtained surgical clearance from her treating physicians; (Exh. 9)

28. With Sisto, now fired, and unable to get Plan Booklets, or any assistance from IBEW, Local 21, SBC and/or Sedgwick she filed a formal grievance to fight her wrongful termination, and many other issues regarding her employment with SBC and the Labor-Management Agreement on September 14, 2001; (Exh. 10)

29. On September 19, 2001, Sisto received no advice or manuals for benefits from SBC, Sedgwick, nor IBEW-Local 21, and retained counsel to file suit in Cook County Chancery Division, State of Illinois, naming as defendants, SBC and Sedgwick, for declaratory, injunctive relief, and retaliatory discharge, in Case # 01 CH 15562, removed to this Honorable Court by Defendants counsel, who then filed a motion to dismiss the removed Chancery cause of action, with law damages alleged;

30. On October 15, 2001, Ms. Ingersol, of Sedgwick, on behalf of SBC, acknowledged Sisto's appeal for Sickness and Accident Benefits, when Sisto is appealing LTD benefits denial; (Exh. 11)

31. On October 18, 2001, "a corrected letter to the 10-15-01" letter, acknowledges Sisto's appeal for LTD, but sets

-8-

forth in her 10-18-01 corrected letter that "Appendix A" of the

LTD Plan, excludes injuries resulting from on the job injuries

which Sisto, is in fact claiming, and was reaffirmed by Ms.

Bradley's letter of 9-14-01, but inconsistent with Ms. Reeder's

May 23, 2001 letter, and the 10-15-01 letter; (Exh. 11 & 11a)

32. On November 5, 2001, Sisto underwent, anterior cervical

disectomy and interbody fusion, performed by Dr. Gireesan,

at Northwestern Memorial Hospital in Chicago, Illinois;

33. Dr. Gireesan, per his letter of 12-21-01, attached,

(Exh. 12) diagnoses Ms. Sisto's condition as follows:

> Diagnosis: Our diagnosis on Ms. Eivira Sisto based on
> clinical examination and radiographic findings is that she had
> a herniated disc at the C3-4, and C5-6 level, accounting for
> the pain in the neck area, left shoulder area upper extremity,
> and with a thoracic disc at the T6-7 level, accounting for the
> pain in the midback area, with radiating to the right lower
> extemity, aggravated as the result of a fall at work...she is
> in a cervical orthosis...for three months from date of surgery,
> 11-5-01...we will put her through a physical fitness program...
> Regarding her lower back condition, we will certainly monitor
> her situation and decide on a treatment plan...Prognosis is
> certainly guarded, (Dr. Gireesan does not return Sisto to work
> and this narrative report is similar to his pre-operative
> report, dated May 1, 2001...(Exh. 4)

34. Allison Langerman, R. N., a Sedgwick employee, adjusting

and authoring a letter dated December 6, 2001, from the "SBC

Quality Review Unit" affirmed the denial for LTD benefits, for

the following reasons:

> a) Refers to Appendix A of the LTD Plan, well knowing said
> document excludes on the job injuries;
> b) All medical records relevant to the Review were evaluated
> but no restrictions had been documented, (except "no work of
> any kind from Dr. Gireesan, Dr. Charles Slack, and recommend-
> ations for cervical and thoracic surgeries, with objective
> positive test results, with herniated discs, in the neck, mid
> back, and low back with right leg radiculopathy);
> c) Dr. Muellner's letter of March 13, 2001 is mentioned for
> an RIC pain management program, (but does not incorporate Dr.
> Muellner's 4-3-01, (Exh. 9) narrative letter, stating no
> functional plans until Sisto's physician's clear her and find
> no surgery is required to prevent re-injury, and to have the
> proper diagnoses and treatment, with a copy sent to Ms.
> Gulersarian, R. N., the owner of Proficient Case Management,
> L.L.C., stating that all records were reviewed from 11-7-2000

d) The 12-6-01 affirmation of denial letter, goes on to state that Sisto was notified in writing that failure to show up for (functional capacity) examination will result in denial of your LTD Benefits, (which was negotiated with Ms. Bradley, by Sisto's attorney, Frank Soto, who requested Dr. Elizabeth Wallner to advise her of Sisto's work restrictions of a one hour limitation of sitting, and/or writing, which was in fact sent to Ms. Bradley on 8-8-01; (Exh. 7)

c) The denial letter fails to mention that Dr. Wallner, put the aforementioned restrictions on Sisto, of diabetis, hypothyroidism, obesity, are difficult to control secondary to persistant back pain, but Dr. Wallner does not treat her (but referred Sisto to Dr. Gireesan) for the treatment of disc prolaps at C3-4, C4-5, T5-6, T6-7, and carpel tunnel syndrome, (confirmed by EMG by Dr. Aggarwal, a neurologist treating Sisto at Northwestern Memorial Hospital;

f) Lastly, on page 4, Ms. Langerman, R. N. states: "...it is questionable if Sisto is entitled to LTD benefits pursuant to the provisions of the Ameritech LTD Plan". (Exh. 13)

35. After the initial State Chancery action was removed the parties through counsel, appeared for status, before this Honorable Court, wherein, the Court suggested to Defendants' counsel to turnover Plan documents, to Sisto's attorney, which was in fact done on December 5, 2001, by letter including therein 3 separate manuals, which Sisto had been requesting, since she received the May 23, 2001 letter, (See Exh. 1), from SBC-Human resources, from Ms. Bradley, who said she would send them but never did, and from her IBEW, Local 21 union, with no results;

36. The three (3) booklets tendered, effective, 6-1-96 to Sisto's attorney purportedly covered:

a) Ameritech's Sickness and Accident Disability Benefit Plan;
b) Ameritech Long Term Disability Plan;
c) Using the Ameritech Non-Management Disability Plans.

37. The Sickness and Accident Plan Manual does not exclude benefits, if the injury and resulting disability is job related;

38. Appendix A of the Long Term Disability Plan (See Exh. 11 (a), which states: "Disability" or "Disabled" immediately following the Waiting Period shall mean an illness or injury, other than accidental injury arising out of and in the course of employment by the Company..."

39. The booklet entitled "Using the Ameritech Non-Management

-10-

Disability Plans" page one states:

"The disability benefits provided by the Ameritech Disability
Plans (or the Plans) are designed to help provide financial
protection and security for you and your family if you should
become disabled during your career with the Company. The
Plans provide income for short- and long-term periods at no
cost to you." (Exh. 14, Page 1)

40. Page 7, Exh. 14, "Using the Plans" indicate that

Accident Disability and LTD Plans ends on the first to occur of

the following: -your employment ends for any reason, including
your death) does not apply to LTD coverage if employment
ends because of receipt of LTD benefits-...

41. Pages 5 and 11, Exh. 14, states: "You will receive
benefits for total disability if you are completely
disabled as a result of an ON THE JOB ILLNESS OR INJURY"

"You are considered totally disabled if you are
completely unable to perform your regular job as a
result of an illness or injury caused by, and in direct
connection with, the performance of an assigned duty in
the Company...after your full-pay period is over, you'll
receive half pay ... as long as you remain totally
disabled"

42. Page 13, Exh. 15, states: "You are considered partially
disabled if you are unable to fully perform your regular
job as a result of an illness or injury caused by, and in
direct connection with, the performance of an assigned
duty with the Company." (benefits upto six years)

43. Both pages 11 and 13, Exh. 15, advise Sisto to refer to:
"Coordinating Benefits With Workers' Compensation"
section for details on how the Plan pays benefits when
you also receive Workers' Compensation."

44. Sisto, nor her counsel, has ever seen, nor was tendered,

the Coordinating Section, relating to the details of how Plan

Benefits, are or may be affected by the weekly workers compen-

sation benefits, she was paid from 7-31-00 through 11-15-01,

which later date was after the initial Court status on Removal

herein, even though Sisto remains disabled, and was found

totally disabled from any gainful employment, by the Social

Security Administration, by formal written decision, as required

and requested, for Sisto to apply for same, in order to be

eligible for LTD, as SBC would get a setoff, pursuant to Ms.

Reeder's May 23, 2001 letter; (See Exh. 1, Page 2)

45. Sisto maintains that SBC, Individually, and by and through their agent, Sedgwick, failed and refused to give Sisto, nor her attorneys, Plan manuals in violation of E. R. I. S. A., forcing her to retain attorneys to protect her rights under the Plans, and forced the initial state court chancery suit, and Defendants removed said suit to this Honorable Court with a motion to dismiss, well knowing, or should know what rights under the Plans Sisto is entitled;

46. Sisto maintains that SBC, Indivually, and by and through their agent, Sedgwick, exercised arbitrary. capricious, vexatious, willful, and wanton denial of the proper Plan Benefits, in violation of ERISA for the following reasons:

   a) Sedgwick adjusters, knew that Sisto was not capable of sitting for more than one hour, had 4 or more herniated discs and required surgery as early, if not earlier, by January, 2001, and August, 2000, MRI's, and the progress reports from Ms. Gulersarian, objective tests, and ignoring other reports not mentioned in their denial letter of 9-14-01, and 12-6-01;
   b) Sedgwick, knew as early as May 1, 2001, that Sisto required cervical and thoracic surgery's as early as the May 1, 2001 report of Dr. Gireesan; (See Exh. 4)
   c) Sedgwick, knew or should have known, that Sisto was not to be involved in any functional capacity tests without surgical clearance, based on Dr. Muellner's report of 4-3-01, as it was copied to their retained rehab nurse, and included in their removal petition to this Honorable Court; (See Exh. 9)
   d) SBC, should have made, Sedgwick adjusters, aware of the Plans, first received by Sisto's attorney, shortly after 12-5-01, as Sisto, has no legal authority for coordination of workers compensation, and benefits that have been wrongfully denied by Sedgwick and SBC;
   e) Lastly, Ms. Bradley, a SBC employee in her denial of LTD letter of 9-14-01, (See Exh. 8) uses a DIFFERENT STANDARD of work ability, to deny LTD benefits per the booklet, (Exh. 14) wherein, total or partial disability is defined as Sisto's inablility to perform her "regular work", and not "any occupation or employment" as set forth in the aforementioned letter, even though, Sisto is unable to be gainfully employed in any occupation, based on her treating physicians, and her restricted mutliple conditions of ill-being and recently having cervical disectomy and fusion, (11-5-01) and Sisto facing thoracic disc surgery, and lumbar care for right

lateral carpel tunnel sydrome with therapy recommended for her
hands and wrists by Dr. Aggarwal, a Northwestern staffed, neurol-
gist;

47. Sisto maintains, further, that Sedgwick, with the know-
ledge of SBC, and/or its acquiecence of Sedgwick, seek to term-
inate Sisto, as early as May 23, 2001, and in violation of the
Labor-Management Agreement fails to inform the IBEW, who could
have taken action, but Sisto notifies, IBEW, Local 21, repeated
times but does nothing about it, but says they will investigate;

48. SBC, and Sedgwick, knew that Sisto's conditions of ill-
being, as she was receiving workers compensation benefits from
7-31-2000, through 11-5-01, as the medical records in the
in-house SBC Disabilty Center in Chicago, Illinois, has Sisto's
entire claim on Sedgwick computers, and the LTD and workers
compensation adjusters, are in the same office area, as was told
as to both allegations by Sedgwick adjusters to Ms. Sisto and her
counsel;

49. SBC, through Sedgwick, terminates Sisto, on 8-5-01, based
on their 5-23-01 letter, per Ms. Bradley's statement to Ms. Sisto
with LTD denial using the wrong Standard per the Plan, allows
SBC a non-admission of partial or total disbility, denies her
group insurance, forcing COBRA payments by Sisto, which has led
Sisto loss of her car, to sell her home, as it was going to be
foreclosed, to sell her antiques, and to help mitigate her
pending workers compensation claims, resulting in severe finan-
cial harm to Sisto, and the costs of retaining counsel to
prosecute, this claim and underlying state court action removed
herein.

WHEREFORE, Sisto prays to this Honorable Court for Judgment
in her favor, and against SBC, and for this Honorable Court to

Sisto the following relief:

1. To investigate and determine if SBC and their agent, Sedgwick, denied Sisto, LTD benefits, or any other benefits based on wrong medical evidence, and a wrong work standard;

2. If this Court, should determine that Sisto is entitled to and qualifies for LTD, that same be awarded, with any proper credits, since Sisto is on Social Security Disability, workers compensation benefits received through November 15, 2001, with Plan set offs, or credits, pursuant to the Plan;

3. That SBC reimburse and continue all benefits, such as group insurance, life insurance, and repay all COBRA costs since Sisto's termination since 8-5-01;

4. To assess attorneys fees in a multiplier permitted by law for SBC's conduct in allowing Sedgwick, to terminate and deny Sisto, LTD benefits pursuant to the Plans, all of which Sisto and counsel still do not possess, as the "Coordinating Workers Compensation Benefits" with Plan Benefits;

5. To assess the approriate ERISA penalties for withholding Plan documents from Sisto and her counsel;

6. Any further relief this Court deems just and proper.

### COUNT II - VIOLATION OF THE LABOR MANAGEMENT AGREEMENT AGAINST SBC

Now comes the Plaintiff, Sisto, and adopts and incorporates by reference, Paragraphs 1 through 49 of Count I, as Paragraphs 1 through 49, of Count II and further pleads as follows:

50. Sisto maintains that SBC, Individually or through their agent, Sedgwick, violated the Labor Management Agreement in effect from June 28, 1998 through June 28, 2003, of which SBC and IBEW, Local 21, consolidated, were the two parties thereto, with Sisto a full dues, paying member, on and before, and after her termination on August 5, 2001, in the following breaches and contract Article and Paragraph numbers:

51. Article 13-Problem Resolution Procedures, Sec. 13.02, pursuant to the contract mentioned in the preceding paragraph, SBC must notify that it "contemplates" terminating Sisto for "just cause" as early as May 23, 2001, by Ms. Reeder's letter;

-14-

52. SBC terminated Sisto on 8-5-01, based on its May 23, 2001 letter, from Sedgwick's employee, Debbie Reeder, stating, "...your short term disability benefits expire 8-5-01, (even though SBC and Sedgwick, knew or should have known that Sisto was receiving workers compensation benefits, for a 10-27-99 fall in the womens' washroom on water, with her last day of work, July 31, 2000, preceded, by an attempt to return to her regular sitting work, as a customer service representative for SBC telephone customers, and received weekly workers compensation benefits from 7-31-2000 through 11-15-01) "... under the provisions of the Plan, your employment with Ameritech will also end on that date", and SBC through Sedgwick terminated Sisto;

53. To this date Sisto maintains that as a union member, and off due to an on the job injury, SBC violated the union contract for terminating Sisto, by some Plan documents that she does not possess, as the letter terminating her was incorrect, since she was not on Short Term Disability benefits, since 7-31-00, thereby the termination was a breach of the Labor Management Agreement, and any Plans that are derivative, from said agreement;

54. SBC violated Appendix A, Page 166, Section 1, as part of the Labor Management Agreement, in that it failed to give Sisto, SBC or Ameritech common stock as part of SBC's success, for Union represented employees, for the years, 1999, 2000, and 2001, as set forth above; (Exh. 15)

55. Sisto maintains that SBC, through Sedgwick violated Article 3 - Non-Discrimination - of the Labor Management Agreement, at Page 28, (Exh. 16) in that said Article prohibits SBC nor the Union to:

"unlawfully discriminate against any employee because of such employee's race, color, religion, sex, age, sexual orientation or national origin, or because the

by applicable Federal, State, or local law;

56. Sisto maintains, that she is a minority, to both SBC, and IBEW Local 21, in that she is DISABLED due to her on the job injury in progressing the interests of SBC, and in a protected class of individuals, and SBC, and their agent, Sedgwick, and/ or the IBEW Local 21 has discriminated against her, before and after her August 5, 2001 termination, for the reasons set forth above, and the fact, that SBC - Human Resources, nor her Union, will assist her in getting corrected W-2 forms for the years 1999, and 2000, when she was on workers compensation, a tax free benefit, but SBC continues not to correct, her W-2's and Sisto is therefore penalized by the IRS, and loses interest on her funds, or shall owe same, as Sisto has no other reasons why SBC would treat her as pled in this Paragraph, and the previous pled Paragraphs, as SBC, nor the Union-Local 21, mostly staffed by SBC personnel, do not care about a permanently disabled employee, all actions and inactions by the Parties, leads Sisto to DISCRIM-INATION and dollars, as the reasons that this matter has evolved from a workers compensation claim, to forcing her to retain counsel for a state chancery court to declare the rights of the parties, and ends before this Honorable Court, to either defend SBC and Sedgwick's Motions to Dismiss the Removed Action, or to file this Amended Complaint, with all issues set forth, within the knowledge of Sisto, and her counsel;

WHEREFORE, Plaintiff, Sisto, prays to this Honorable Court to enter judgment in her favor and against SBC and grant the following releif:

1. If the Court should find that SBC breached the Labor Management Agreement, that the Court should order SBC to cure all material breaches;

2. That the Court should order SBC to pay Sisto's counsel

-16-

employee of SBC, and has not breached any agreement, but is at
the mercy of SBC, Sedgwick, and IBEW-Local 21, and has no
recourse but to plead her case before this Honorable Court, and
also seek costs of this litigation;

3. Whatever other releif this Honorable Court deems just and
proper.

COUNT III - VIOLATION OF 301 OF THE LABOR RELATIONS
MANAGEMENT ACT, 29 U. S. C. 158, DUTY FOR FAIR REPRESENTATION

Now comes the Plaintiff, Sisto, and incorporates by refer-
ence Paragraphs 1 through 56 of previous Counts I and II, and
repleads Paragraphs 1 through 56 as Count III, and further com-
plains against IBEW-Local 21, as follows:

57. Sisto, at all relevant times herein was a dues paying
member of the Local, for Customer Service Representatives, now
consolidated into Local 21, located in Downers Grove, Illinois;

58. When Sisto received SBC's letter dated May 23, 2001,
advising that she was on Short Term Disability, and would be
terminated in just over 2 months, on August 5, 2001, Sisto called
her Local 21, numerous times with no responses by telephone, with
no response, or IBEW is investigating; (See Exh. 1)

59. Sisto, on September 6, 2001, she learned from Ms. Bradley
by telephone, that her LTD had been denied, and that she was
terminated as of August 5, 2001, based on the May 23, 2001, with
COBRA and other papers sent to her by SBC/Sedgwick dated 8-31-01,
a grievance was emailed to the IBEW-Local 21, and mailed certi-
fied mail-return receipt on September 14, 2001; (See Exh. 10)

60. Sisto did not bring suit against IBEW # 21, since she
had hoped that they would act in accordance with the grievance
procedure set forth in the Labor Management Agreement in effect,
Article 13.10-Grievance Procedure, 13.11, through 13.28; (Exh.
17)

61. Sisto had not heard from IBEW #21 at the time of the

of the filing of this Amended Complaint, being almost 4 months since she filed her grievance with IBEW Local #21, for unlawful termination, denial of LTD, and all other issues raised in her formal grievance;

62. IBEW #21 was called following the filing of said grievance, more than a few times, but Sisto received either no response, or that the matter "was being investigated";

63. Sisto maintains that IBEW #21 owes her a duty to fairly and diligently represent her purusuant to the Labor Management Agreement between SBC and IBEW #21, and federal law, namely 29 U. S. C. 158, Section 301 of the Labor Management Relations Act;

64. Sisto maintains that her union, IBEW #21, to the best of her knowledge and belief, did not present her grievance to SBC Labor Relations, according to the grievance procedure set forth above (Exh. 17), nor did said union ever contact, her orally or in writing, and tell her that she had no viable grievance relating to her 8-5-01 termination, denial of LTD, as she was a DISABLED person, due to her on the job injury of 10-27-99, as set forth in her 9-14-01 grievance;

65. Sisto advised IBEW #21, as did her counsel, that he was not representing Sisto regarding her termination, since that was the obligation of IBEW, on more than one occasion, after the May 23, 2001 letter, but before 9-6-01, when Sisto received actual knowledge that SBC terminated her on August 5, 2001, based on SBC letter sent to her May 23, 2001; (Exh. 1)

66. Sisto maintains that IBEW #21 discriminated against her as she was a DISABLED person, due to an on the job injury of 10-27-99, in violation of Article 3, of the SBC/IBEW Agreement; (See Exh. 3), in that they believed that she was helpless, physically, emotionally, and financially, and sought no relief

or assistance, since they either thought she would take no action against IBEW #21, because of her conditions of ill-being, or being staffed mostly with SBC employees, they sought not to make any fair representation, and take Sisto's grievance, through the contract grievance process, for fear of "making waves" or setting some type of "precedent" for other disabled union persons, whether injured on the job or not;

67. Sisto maintains that IBEW #21 breached its duty owed to fairly and properly represent her, given a proper grievance filed timely, both by U. S. Mail, and e-mail, and she is a member of a protected member of a class of union members that need union representation due to her disability, and financial problems, as she paid them union dues regularly taken out of her check for this very reason, that being fair, impartial and objective representation for violations of the aforementioned labor agreement in effect, during all relevant times grieved against SBC, and through Article 13, of said agreement, Problem Reso-lution Procedures, Pars. 13.01, et. seq. (See Exh. 5).

WHEREFORE, Plaintiff, Sisto, prays for judgment in her favor and against the Defendant IBEW-Local 21, and requests the follow-ing relief:

1. That if this Honorable Court finds that IBEW violated its duty to fairly represent the Plaintiff, under case law, and pursuant to Section 301 of the LMRA, that it order the Union to to properly grieve, and make sure that SBC, gives Sisto, all benefits she is due under the Agreement, and to correct any actions or inactions by SBC, or its agents, namely Sedgwick, the in-house Ajusting Co. for LTD, and workers compensation benefits, common stock owed to Sisto, corrected W-2, pay all medical bills pre and post 11-5-01 cervical surgery, since Sisto's credit rating has been permanently damaged;

2. For this Honorable Court to award attorneys fees in favor of Sisto, and against IBEW-Local 21, since if it did what it should have done, to fairly represent her, and listened to and responded to her calls, and answer with substance, and reply to her grievances, Sisto would not be forced to take this action;

-19-

COUNT IV - RETALIATORY AND/OR WRONGFUL DISCHARGE
BY SBC, AND SEDGWICK, THE IN-HOUSE ADJUSTING SERVICE FOR
SBC'S WORKERS' COMPENSATION BENEFITS

Now comes the Plaintiff, Sisto, and realleges and incorpor-
ates by reference Paragraphs 1 through 56 of Counts I and II, as
Paragraphs 1 through 56 of Count IV, and complains further as
follows:

57. There exists pursuant to Illinois State Statute the
following Act, and Section, 820 ILCS 395 (4h):

> "It shall be unlawful for any employer, individually, or
> through, any insurer, or service co. (Sedgwick) to dis-
> charge or threaten to discharge...an employee because of
> the exercise of his or her rights or remedies granted to
> or by this Act."

58. As previously pled, SBC, subcontracted to Sedgwick, an
adjusting service company, to adjust, all workers' compensation
claims, and in this instant claim, also Sisto's claim for Long
Term Disability Benefits, which Sedgwick had used the wrong
work standards, and the wrong medical evidence, and falsely state
that Sisto was on Short Term Disability expiring 8-5-01, when
Sisto, was on workers compensation benefits, and Sisto's counsel
explained that to Sedgwick, by letter to Debbie Reeder, by his
letter of June 24, 2001, (See Exh. 6), which was triggered by
her letter on SBC stationery, dated May 23, 2001, that Sisto
would in fact, be terminated per a Plan (unknown to date), since
her year of Short Term Disability Benefits, would expire on
8-5-01, and she would be then terminated; (See Exh. 1)

59. SBC, and Sedgwick, on May 23, August 5, August 31, and
September 6, 2001 knew or should have known, by merely looking
at their computer screens and SBC payroll department, that Sisto
was not on STD Benefits, but at all relevant times on workers'
Compensation benefits, and should have never been terminated,
as she was merely exercising her rights under the Act,

-20-

60. Sedgwick knew that if had denied Sisto LTD benefits, and terminated her for cause, in the face of strong medical evidence to the contrary, and that she required multiple back surgeries, due to two herniated cervical discs, two herniated cervical discs, and a right lumbar disc disease with right leg radiculopathy, as early as May 1, 2001, pursuant to Dr. Gireesan's narrative office notes; (See Exh. 4)

61. Sedgwick, for unknown reasons to Sisto to date, then within approximately 3 weeks, drafted an SBC letter, dated May 23, 2001, from Debbie Reeder, telling her the aforementioned information, which was knowingly false, and was then advised by Sisto's counsel with his letter of June 24, 2001;

62. Sedgwick, and SBC knew, that Sisto had pending workers compensation claims, and by terminating her for cause, and not granting her LTD, (and not using the correct work standard set forth in the manuals turned over to Sisto's counsel after, December 5, 2001) for incorrect and improper reasons, they would lessen and mitigate the SBC exposures, in prosecuting her workers compensation claims before the Illinois Industrial Commission.

63. If the LTD denial by Ms. Bradley of Sedgwick using her standard of "employee cannot work in any employment" she knew or should have known, that said admission would be used by Sisto against SBC in prosecuting her workers compensation claim, in seeking Permanent and Total Disability, the highest award an injured employee can receive and would cost, SBC the most dollar amount, and Sedgwick, and Ms. Bradley, knew this or Debbie Reeder her manager knew this and should have known this ramification of their actions against Sisto;

63. Sedgwick, and SBC, knew that if Sisto was terminated for cause, that also would or could, affect the workers compensation

claim at the Illinois Industrial Commission, since said admin-
istrative body, connotes an adverse interest against Sisto for
a termination for cause, Sedgwick and SBC well knowing this
ramification of their 8-5-01 termination, known to Sisto as late
as 9-6-01;

64. Sedgwick, and SBC, also knew that if they terminated
Sisto on 8-5-01, and denied her LTD for knowingly wrong reasons,
that she would have to pay COBRA benefits to have group health
benefits, and other insurances, so she would be short of funds,
well knowing she would be forced into a premature, early settle
ment with SBC, through Sedgwick, as she already, had to sell her
automobile, had to sell antiques, to save her Chicago residence
from foreclosure, and forced to expend monies to retain counsel
to protect her rights under the Act, not only at the Commission
but in State Court, but now removed to Federal Court, from an
on the job injury, with very serious permanent injuries previous
pled;

65. Sisto queries if she is the only injured employee covered
under the Act and IBEW colective bargaining agreement, with her
inability to work, or does Sedgwick, and SBC, treat other injured
severely disabled workers like Sisto, especially when the IBEW
intervenes, or not as they did not in her claims, and use their
"methods, and course of conduct" with other disabled employees
severely injured on their jobs progressing the interests for SBC
and their customers;

66. Sisto maintains that SBC, through their service adjusting
company, Sedgwick, took willful, wanton, and malicious, and re-
taliatory actions, including termination, and LTD denial, in an
effort to harm and disparage her rights and remedies under the
workers compensation claims, and to force a settlement of same.

67. SBC, and Sedgwick, in terminating Sisto on 8-5-01, and/ or denying her LTD, and treating her wrongly and falsely leading to said termination and denial of LTD, has caused said Defendants to violate the provisions of 820 ILCS 4 (h), for the reasons set forth and plead in this Count IV, and incorporated Paragraphs and attached exhibits, previously plead in Counts I and II.

WHEREFORE, Plaintiff, Sisto, prays for judgment in her favor and against the Defendants, SBC and Sedgwick, jointly, or sever- ally, and if the Court deems appropriate, to award Plaintiff punitive damages, to punish defendants, and to deter their conduct for future severely disabled persons who are injured on the job.

Respectfully submitted,

Stuart H. Galesburg
Attorney for Plaintiff
221 N. LaSalle St., # 2300
Chicago, Illinois 60601
312.400.4600

## Verification of Amended Complaint and Affidavit

I, Elvira A. Sisto, have read the attached Amended Complaint, filed against my former employer, SBC/Ameritech, to be true and correct where I sustained a serious and permanent on the job injuries on October 27, 1999, Sedgwick James of Illinois, whose employees adjusted my workers compensation claim, and long term disability claim, and had me terminated. With SBC/Ameritech, and my dues paying union, or labor organization, the Illinois Brotherhood of Electrical Workers, local 21, Located in Downers Grove, Illinois, who did not help me based on numerous phone calls for help and advice, for months and the filing a grievance with them on September 14, 2001, as I discovered that I had been terminated on August 5, 2001 for the first time by a phone call to a Sedgwick James employee on September 6, 2001. That as a result of a fall on October 27, 1999, I sustained two cervical herniated discs, two thoracic herniated discs, aggravation of a lumbar disc previously injured in 1995, and that Dr. Giri Gireesian, orthopedic surgeon, performed a cervical disectomy and fusion upon my neck on November 5, 2001, at Northwestern Memorial Hospital, and that when I recover, and my internist clears me from aggravated obesity, diabetics, and hyper thyroidism, I am scheduled to have thoracic discs surgery, and am presently on off work status with my last day of work being July 31, 2000, and have been on workers compensation benefits, at least through November 15, 2001, and Social Security Administration has found me permanently and totally disabled by written decision, but have to pay for my Cobra benefits since I was fired, and cannot collect Medicare if SBC is responsible for my future medical care according to new federal guidelines.

Signed and sworn to
before me this _____ 7 th _____ day of



_January , 2002_ .

_Patricia M. Mekinski_
Notary Public

PATRICIA M. MEKINSKI
Notary Public, State of Nevada
Appointment No. 99569301
My Appt. Expires June 16, 2003

_Elvira A Sisto_
Elvira A Sisto



SMAART
P.O. Box 8046
Chicago, IL 60680-8046
Telephone 1-866-BSMAART (1-866-276-2278)
Facsimile 312/356-0015

May 23, 2001

Elvira Sisto
4941 N. Nottingham
Chicago, IL 60656

Re: Long Term Disability
SS#: 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

Dear Ms. Sisto:

According to our records, your Short Term Disability benefits expire 8/5/01. Under the provisions of the plan, your employment with Ameritech will also end on that date.

In reviewing your case, we believe you may be eligible for benefits under the Ameritech Long Term Disability Plan as of 8/6/01.

In order to further evaluate your eligibility to receive Long Term Disability (LTD) Benefits, we ask that you sign and return the enclosed forms as soon as possible.

- Statement of claim - provides information needed in order to evaluate your claim for benefits including your current address, telephone number, date of birth and any disability income you may be receiving.

- Medical Records Release - gives doctors your permission to release medical information to the Center staff. To be eligible for LTD benefits, a physician must provide objective medical evidence which supports an inability to work.

- Agreement Concerning Long Term Disability Benefits - confirms that you understand that the LTD benefit is reduced by any amounts payable to you under Social Security Disability or Retirement, Disability Pension and Workers' Compensation and that you are responsible for any overpayment made to you under the LTD Plan.

- Training, Education & Experience Statement - gives the center background information about your education and work experience. To be eligible for LTD benefits, you must be totally disabled as defined by your Long Term Disability plan.

- Authorization to Secure Award or Disallowance Information - gives the Social Security Administration your permission to release information about any award or denial to the Center staff.

Exh 1

- W-4 Form - since disability benefits are subject to federal income tax, you will need to complete and return the W-4 form to SMAART.

- Electronic Funds Transfer Form - This form affords you the opportunity to establish direct deposit of your monthly LTD check into your bank account.

We will continue to process your claim for LTD benefits pending the receipt of these completed and signed forms. If we have not received your completed and signed forms within 30 days of the date of this letter, we will withhold any LTD benefits due until they are returned and a decision can be reached. A postage paid envelope is enclosed for returning your signed forms.

After reviewing these forms, the SBC Medical Absence & Accommodations Team (SMAART), the LTD plan administrator, may request additional information and documentation to determine your eligibility for benefits. Your prompt attention to any correspondence from the center will help expedite a decision on your claim.

The Long Term Disability Plan under which you are insured requires that you provide to the Center:

- Proof that you have applied for Social Security Disability benefits, such as a copy of the Receipt of Claim Form provided by the Social Security Administration.

- Information relative to the claim determination made by the Social Security Administration, such as a copy of the notification, award or check you receive.

We can advance you any benefits for which you might be eligible under Social Security only for a period of three months. If at that point we have not received your proof of application, award or denial your LTD benefit will be reduced by an estimated amount of Social Security Disability benefits. If we have received your proof of application, we will continue to advance you any estimated Social Security Disability benefit until the Social Security Administration has made a determination on your claim.

If you are approved for Long Term Disability benefits, you will receive your payments monthly. Checks are payable on the last day of the month.

You may be entitled to other benefits based on your years of service and/or your Long Term Disability status. Please contact SBC Connect at 877-722-0020 for information as to which health, vision, dental, and life insurance benefits you may be entitled.

You may be entitled to pension benefits at the completion of your 52 weeks of Sickness Disability benefits. At the time you were sent this letter, your name, social security number and expiration of Sickness Disability benefits date was sent to your pension administrator. Please contact your Pension administrator at 800-557-3640 for information regarding Pension.

Your LTD case manager will be able to explain if and how your pension benefits are integrated into your Long Term Disability income.

If you have any questions about Long Term Disability, please call the SMAART at 1-888-212-3300 between 8 a.m. and 5 p.m., Central time, Monday through Friday.

Sincerely,

*Debbie Reeder /KH*

Debbie Reeder
Long Term Disability Manager
SBC Medical Absence & Accommodations Team
SMAART

# Ameritech

## Attending Physician's Report of Injury or Illness

Form AM975
(8/97)

ATTENTION MANAGER: For proper completion of this form and for mailing addresses, please read the instructions attached before completing this form.

### SECTION 1 — EMPLOYEE INFORMATION

Employee Name: *ELVIRA Sisto*

Social Security Number: *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*

Work Address: *2401 N Grace St*

City, State and Zip Code: *Chgo IL 60618*

Responsibility Code: *QDB31100*

Manager's Name: *Phone / Jualine Chair*

Manager's Telephone Number: *773-509-4788*

Date and Time of Accident: *10-27-99  7:58am*

### SECTION 2 — EMPLOYEE AUTHORIZATION for RELEASE of MEDICAL INFORMATION

I authorize the physician to release this and any other information regarding this injury/illness to the Medical Director and Benefit Committee of Ameritech.

Date: *10-27-99*

Employee's Signature: *Elvira A Sisto*

### SECTION 3 — TREATMENT INFORMATION

**To Be Completed by the Attending Physician**

1. Date of Initial Examination: *10-27-99*  Date of Most Recent Examination: _____  Date of Next Examination: _____

2. Pertinent history to cause/nature of injury/illness: *PATIENT SLIPPED ON BATHROOM FLOOR AT WORK STRIKING BUTTOCKS / LOW BACK / NECK*

3. Diagnosis: *MUSCULOSKELETAL PAIN S/P FALL*

4. Surgical procedure, if any: *N/A*  Hospitalization dates, if applicable: _____

5. Is present condition related to patient's employment? No ☐ Yes ☑  Explain: _____

6. Treatment (check applicable): ☑ Prescription Drugs *NAPRISYN, DARVOCET N-100*
   ☐ X-Rays Taken? Results: *THORACIC SPINE, LUMBAR SPINE RIBS (NL)*
   ☐ Other: *PULSE OX (NORMAL)*
   ☐ Referral: Date(s) _____ Name _____ Address _____

7. Disposition:
   A. Returned to Work (Date) *10-27-99*
   ☐ Full Duty
   ☑ With Restrictions - Est. Length of Time _____ Weeks
   **Check the applicable restrictions**
   ☐ No motor vehicle operation
   ☐ No lifting over *FIVE* pounds   *NO PROLONGED STANDING*
   ☐ No pole or manhole work   *NO PROLONGED SITTING*
                              *NO BENDING*

   ☐ No use of _____ hand(s)
   ☐ No rung ladder climbing
   ☐ No prolonged walking or standing
   ☐ No repeated squatting or bending
   ☐ Sedentary work only
   ☐ No working alone for prolonged periods (over one hour)
   ☐ No work around dangerous machinery
   ☐ No work at elevation (scaffold, stepladders)
   ☐ No job change without clearing Occupational Medicine
   ☐ Other _____

   B. Unable to Work
   ☐ Sent Home
   ☐ Hospitalized
   ☐ Other

   C. Is Employee Discharged from Treatment? ☐ Yes ☑ No  If No, estimated date of return to work: *10-27-99*

Light Duty Work or a Rehabilitation Program is Available at Ameritech and we will, if possible, accommodate restrictions set forth by a Doctor.

Date: *10-27* 19 *99*  Physician's Signature: *Christopher Serpico MD*

Physician's Name: *CHRISTOPHER SERPICO*
Print Name

Telephone Number: *708,450-4975*

Street: *701 W. NORTH AVE. MELROSE PARK*  City, State, Zip *IL 60160*

Call the Ameritech Accident Report Center at 1-800-558-2828 for additional mailing instructions or if you have questions regarding this form.

*Exh 2*



November 1, 1999

Elvira Sisto
4941 N. Nottingham
Chicago, IL 60656

DEAR Ms. Sisto:

Your claim for worker's compensation benefits has been reviewed and accepted. You have not reported lost time for this injury and therefore, are not eligible for benefits under the Ameritech Sickness and Accident Disability Benefit Plan (SADBP)

Worker's Compensation benefits entitle you to the following: 1) payment for lost wages (in accordance with the provisions of the statute), 2) payment of reasonable and necessary medical expenses and 3) if allowed by statute, compensation for permanent partial disability/impairment after you have reached maximum medical improvement.

If you begin to lose time from work as a result of this injury, immediately notify your manager to contact the Disability Service Center.

Should you have any questions regarding your incident, please contact me at 1-888-212-3300.

Sincerely,

Jeffrey Letterly
Case Manager

ER W3

SISTO, Alvira

05/01/01

Ms. Sisto came in with the complaints of pain in the neck area, with radiation to the left shoulder area, lower back area, with radiation to the right posterior thigh and calf area, with severe midback pain radiating circumferential around the chest area anterior. Patient informed me that she fell at work on October 27, 1999. Patient informed me that she went to the bathroom and she did not notice the water on the floor of the stall and she started to slip. Patient informed me that she slipped forwards and she did not want to fall onto the bowel then she shifted her weight backwards and her feet went from underneath her. Ms. Sisto informed me that she landed backwards and she hit the floor pretty hard. Patient was subsequently seen by Dr. Patel and Dr. Charles Jack.

Family History
Family history indicated a history of diabetes in the family, with high blood pressure, and patient suffers from diabetes as well.

Current Medications
Patient is currently on insulin and Synthroid.

Personal History
Reveals that patient is a nonsmoker and she does not drink any alcohol.

Past History
Indicates that patient has had gallbladder surgery in 1998, carpal tunnel release in 1999, and back pain in October 27, 1999 due to a fall at work.

Clinical Examination
Clinical examination today reveals a 5'4" inches tall Caucasian female who weighs 275 pounds. No cranial nerve paralysis was noted. Cervical spine flexion was possible to around 15° and extension to around 10°, and side-to-side rotations were possible to around 30°. Examination of the upper and the lower extremities revealed 5/5 strength. Sensory examination was normal. Deep tendon reflexes were equal in the upper and the lower extremities. Straight leg raising was negative bilaterally. Range of motion of the major joints were very well preserved. Patient is rather overweight.

Examination of the abdomen did not reveal any masses. Pelvic compression/distraction did not produce any discomfort.

Examination of the spine in the standing position did not reveal any deformity. Lumbosacral flexion was possible to around 30° extension to around 10° and side bending to 15° with increased discomfort in the back and the neck area.

Radiological Studies
I reviewed the MRI's of the cervical spine area and these revealed an extruded disc at the C3-4 and C4-5 level more towards the right side.

The MRI's of the thoracic spine area indicates the presence of a herniated disc at the T5-6 level on the right side.

Ex 4 4

SISTO, Elvira

-2-

05/0[...]

Diagnosis
Based on the information that we have our diagnosis on Ms. Sisto is that she has a herniated disc at the C4-5 and T5-6 level, accounting for the pain in the neck and the left shoulder area and the upper extremities, and a thoracic herniated disc, accounting for the pain in the midback area of the right lower extremities, aggravated as the result of a work related injury, with obesity and deconditioning, diabetes and hyperthyroidism.

Today I indicated to Ms. Sisto that she needs to see Dr. Wallner, and get her diabetes and her thyroid condition under control. Then once this is okay she will become a candidate for an anterior cervical discectomy and interbody fusion as an initial procedure.

I have advised the patient to continue with cardiovascular conditioning, general strengthening and stretching program to maintain her overall fitness.

Work Status
Patient is unable to work at the present time.

GTG/jr

GIRI T. GIREESAN, M.D.

40

# ARTICLE 12

## FULL COMMITTEE

12.01 The Company recognizes there is a System Council, composed of a representative (or someone delegated by such representative) of each of the Local Unions 165, 188, 336, 383 and 399, herein referred to as the System Council T-4.

12.02 The Company will designate a representative or representatives of the Company to meet with the System Council T-4. Said System Council T-4 and Company representatives will be known as the Full Committee. It shall be the function of the Full Committee to study and make recommendations to the Parties hereto with respect to such matters as may be presented to the Full Committee relating to any of the Company's plans or practices affecting the educational, health, welfare and social status of employees. In addition, as may be required, matters regarding technological change in the business of the Company will be reviewed by the Full Committee as provided herein.

12.03 Meetings of the Full Committee will be on a monthly basis. Other meetings may be called from time to time on reasonable notice by either the Union or the Company.

12.04 The Committee may, at its discretion, create ad hoc committees to address issues such as safety, training and development and health care cost containment. Such committees shall present their findings to the Full Committee as often as the Full Committee deems neces- sary.

# ARTICLE 13

## PROBLEM RESOLUTION PROCEDURES

### Union Representation & Notification

13.01 At any meeting between a representative of the Company and an employee in which discipline (including warnings which are to be recorded in the personnel file, suspension, demotion or discharge for cause) is to be announced, a Union representative shall be present if the employee so requests. A copy of any non-confidential or non-proprietary documentation used at the meeting shall be provided to the employee at the employee's request.

13.02 In the event the Company contemplates the demotion or dismissal for just cause of any employee, the Company shall notify the Busi- ness Manager or appointed designee of the Local Union involved and review the facts with the Business Manager prior to the actual demotion or dismissal.

13.03 In the event the Company suspends for just cause any employee, the Company shall notify the employee's Chief Steward or Area Rep- resentative as soon as practicable, but not later than the close of the next working day, and review the reasons for the suspension.

### Union - Management Review Board

13.04 After the Company gives notification of a contemplated dismissal for just cause of an employee with six (6) or more months of Net Cred- ited Service, the Union may, within two (2) working days, request that a Union Management Review Board be convened relative to the contemplated dismissal. Such a request by the Union must be made to the appropriate Labor Relations Director.

13.05 Within two (2) working days after the Union request is made, the Company shall notify the Union as to the names of the two (2) Com- pany members of the Board, and the Union shall notify the Company as to the names of the two (2) Union Board members.

13.06 The Board will meet within fifteen (15) days from the original notifica- tion of contemplated dismissal unless extended by mutual agree- ment. It is the Parties' intent that this employee be given a board meeting except in unusual circumstances and the Union shall advise the employee whose dismissal is contemplated of this intent. The purpose of the Board meeting will be to review the facts that are available concerning the contemplated dismissal and to permit the employee (or in his/her absence, the Union) to present any facts which when considering the matter and for the Parties to attempt to resolve the issue. Union Board members who are employees, will partici- pate in the Board meeting without loss of pay during scheduled work- ing hours when the employee whose dismissal is contemplated is present, unless the Company has requested that the employee not be present at the meeting or unless the Company and the Union mutually agree that uncontrollable circumstances dictate otherwise.

41

03/21/1999  21:37    7737748099                    D PGPTM                            PAGE  02



AGREEMENT BETWEEN

Ameritech

AND

INTERNATIONAL
BROTHERHOOD OF
ELECTRICAL WORKERS
LOCALS 165, 188,
336, 383, AND 399

Effective June 28, 1998 through June 28, 2003

# STUART H. GALESBURG

ATTORNEY AT LAW

221 NORTH LASALLE STREET

CHICAGO, ILLINOIS 60601

———

SUITE 2300

LICENSED IN WISCONSIN

AREA CODE 312
FRANKLIN 2-2990

June 24, 2001

SBC Medical Absence & Accommodations Team
Ms. Debbie Reeder-Long Term Disabilty Manager
SMAART, P. O. Box 8046
Chicago, Illinois 60680-8046    Fax 312.356.0015

Re: Your letter dated May 23, 2001, attached directed to:
    SBC Employee: Ms. Elvira Sisto-SSN # 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
    Re: Long and Short Term Disability Benefits and Termination
        8-5-2001
    D/A: On the job injury 10-27-99

Dear Ms. Reeder:

I represent Ms. Sisto on all employee matters, including representing her on the pending workers compensation claim previously handled by Una Brazel, R. N., and now Kit Duffy, and their attorney Todd Shivers.

Ms. Sisto recently gave me your aforementioned attached letter stating that her short term disability benefits were going to expire on 8-5-01, and that her employment with Ameritech will also end on that date...and that she "may" be eligible for long term disability benefits at that time...

I am puzzled by this letter since Ms. Sisto called and spoke to your department, as her IBEW Local 21, told her Sedgewick James and Hewitt & Associates adjust SBC-Ameritech's funds for the plan, sickness and workers compensation benefits. Is this true?

Are you aware that Ms. Sisto sustained a serious fall at work on 10-27-99, with herniated discs in her neck, mid back and low back, with aggravations of her pre-existing conditions of diabetis, immobility increasing her weight and has been prescribed for cervical and thoracic surgery, since there are two each, severely herniated discs in her neck and mid back. Una Brazel, Kit Duffy, Betty Gulesarian, and their attorney can veri-that she is presently and has been on workers compensation (ttd) benefits since her last day of work, 7-31-2000. Also, enclosed is the Ameritech-Physicians report of injury dated the same day of the accident.

Can you tell me so I can advise my client whether this letter is correct, as she at one time was on short term disability, but that was corrected by Ms. Brazel last year? Ms. Sisto is going to receive surgical care and on ttd based on her records, and will you under contract by SBC, as a Sedgewick employee be terminating Ms. Sisto, August 5, 2001, based on what the true facts are in this entire matter

# STUART H. GALESBURG

ATTORNEY AT LAW

221 NORTH LASALLE STREET

CHICAGO, ILLINOIS 60601

---

SUITE 2300

AREA CODE 312
FRANKLIN 2-2990

LICENSED IN WISCONSIN

June 24, 2001

Ms. Debbie Reeder-Long Term Disability Manger
    Re: Elvira Sisto, SSN # 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
Page 2

ercising her rights under the Illinois Workers Compensation Act, receiving her statutory benefits, and getting all necessary and reasonable and causally related medical care, and has not been released by any physician for a return to any work, and her pain clinic referral was put off pending surgical clearance for her cervical and thoracic back.

Could you please get back to me at your earliest convenience so that Ms. Sisto is not terminated from her employment, based on incorrect facts and your letter which does not set forth accurate facts in the first paragraph, "namely that her short term disabilty will expire on 8-5-2001"...which she is not on, but rather workers comp benefits, which dont expire by law or by the union contract between SBC-Ameritech and IBEW - Local 21.

All that I am seeking on behalf of my client is that she be treated fairly and leagally by her employer or any of their adjusting agents, so I thought that I have a legal and moral obligation to bring this to your attention before something more serious comes out of these matters, resulting in harm to all parties concerned.

When you know what the correct answers are can you please call me at 847.982.0110, or fax me at 847.982.0111, since Ms. Sisto is very upset and concerned about your letter and contents, and staring at termination, with all of her other injury and illness problems.

Thank you for your anticipated urgent attention to this correspondence.

SHG/sg
Enclosures-your letter and
   first report of injury, 10-27-99
cc: Ms. Sisto
      Todd Shivers, Esq-Attorney for
         SBC-Ameritech

Sincerely,

Stuart H. Galesburg



# ELISABETH WALLNER, M.D., M.P.H.

201 EAST HURON STREET, SUITE 101
CHICAGO, IL 606
TELEPHONE: (312) 926-08

Nina Bradley, LTD Specialist

August 8th, 2001

Ameritech Disability Service Center

P. O. Box 8046

Chicago, Illinois 60686-8046

Re: Elvira Sisto

Dear Mrs. Bradley,

Elvira has been under my medical care for management of her hypothyroidism, diabetes and obesity since 02/05/2001. All of which are difficult to control due to her inability to exercise secondary to persistent back pain. I am still in the process of adjusting her medical regimen.

Other medical problems, for which I do not follow her are disc prolaps at C3-4, C4-5, T5-6, T6-7, carpal tunnel syndrom ,s/p carpal tunnel release in 04/19 and 05/161999. She continues to complain of inability to remain in sitting position for longer than 1 hour and inability to write or manipulate objects for longer than 1 hour, due to persistent pain.

Sincerely

E. Wallner M.D

SEP 26 2001 10:22 FR SUBT EXEC CUST CONT   314 331 2444 TO 83128458871      P.25 28

FROM : STUART  ORLESBURG ATTY MI          FAX NO. : 847-982-0111          SEP. 25 2001 09:20AM  P22

09/20/2001  02:56    7737748099              D PGPTM                              PAGE  01



SMAART
P.O. Box 6046
Chicago, IL 60680-6046
Telephone 1-866-BSMAART (1-866-276-2278)
Facsimile 312/356-0015

September 14, 2001

Frank J. Soto
452 North York Road
Elmhurst, IL. 60126

Re:   Elvira Sisto
      Long Term Disability claim
SS#:  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
Claim #:  A125009544

Dear Mr. Soto:

We have completed our review of Ms. Sisto's claim for Long Term Disability benefits and
have determined she is not eligible for benefits according to the Plan. According to the
terms of Ms. Sisto's Ameritech Long Term Disability Plan, Disability is defined as
follows:

> "Disability" or "Disabled" immediately following the Waiting Period shall mean an
> illness or injury, other than accidental injury arising out of and in the course of
> employment by the Company, or a Participating Company, supported by
> objective medical documentation, that prevents the Eligible Employee from
> engaging in any occupation or employment (with reasonable accommodation as
> determined by the Company or its delegate), for which the Eligible Employee is
> qualified, or may reasonably become qualified, based on training, education or
> experience. An employee shall continue to be considered disabled if prevented
> by reason of such illness or injury, supported by objective medical
> documentation, from working at a job which pays wages which, when combined
> with benefits payable from the Plan, equal less than 75% of the Eligible
> Employee's Base Pay at the time the Disability occurred

This determination is based on a review of medical information provided by Charles M.
Slack, MD., Sandeep K. Aggarwal, MD., Martin G. Luken III, MD. from the Chicago
Institute of Neurosurgery and Neuroresearch, Michelle Muellner, MD from the
Rehabilitation Institute of Chicago, Giri T. Gireesan, MD., George R. Cybulski, MD.,
FACS., and Elisabeth Wallner, MD, MPH.

In a report dated January 21, 2001 Dr. Slack concluded that Ms. Sisto had medical
pathology and that she would be totally disabled from her work, but did not provide
specific restrictions and limitations with respect to her ability to function in other
occupations.

A February 5, 2001 nerve conduction study and EMG by Dr. Aggarwal was indicative of
carpal tunnel syndrome with evidence of ongoing denervation on the left side and
Chronic, mild, bilateral C7 cervical radiculopathy with evidence of minimal ongoing

denervation on the left side. However, Dr. Aggarwal did not indicate how these limit Ms.
Sisto's ability to function.

Based on his examination of February 14, 2001, Dr. Luken reported the following. "...in
my view she very likely is capable of some sort of gainful employment, and I deferred
comment regarding the extent of her disability to a formal work capacity evaluation."

Based on her March 7, 2001 examination, Dr. Mueller diagnosed Ms. Sisto with bilateral
carpal tunnel syndrome, bilateral C7 radiculopathy, postural abnormalities,
deconditioning and pelvic girdle muscle imbalance. However, Dr. Mueller did not indicate
how these limit Ms. Sisto's ability to function.

In office notes dated May 1, 2001 Dr. Gireesan diagnosed Ms. Sisto with a herniated
disc at the C3-4 and T5-6 levels and a thoracic herniated disc, with obesity and
deconditioning, diabetes and hypothyroidism. However, Dr. Gireesan did not indicate
how these limit Ms. Sisto's ability to function.

In office notes dated July 5, 2001 Dr. Cybulski describes Ms. Sisto's complaints and
reports that she has not had any physical therapy. His exam documents full range of
motion of the neck, negative Spurlings maneuver, and no muscle spasms in the back or
neck. He goes on to document a neurological exam that is normal except for bilaterally
decreased reflexes. Sensation is in tact, tone and strength are in tact, reflexes are
symmetrical.

In a letter dated August 8, 2001, Dr. Wallner reports that Ms. Sisto has been under her
care for hypothyroidism, diabetes and obesity since 2/5/01. She reports that all of these
are difficult to control due to Ms. Sisto's inability to exercise. She reports that Ms. Sisto
also has disc prolapse at C3-4, C4-5, T5-6 and T6-7 and that she continue to complain
of an inability to remain in a sitting position, write or manipulate objects for longer than 1
hour. However, she did not provide information to indicate that the conditions that she is
treating Ms. Sisto for would limit her ability to function. She also did not provide medical
to support the limitation of function, which Ms. Sisto reported.

As we were unable to get a clear picture of Ms. Sisto;s functional capacity, a functional
capacity evaluation was setup with a physiatrist. We scheduled Ms. Sisto for this
evaluation twice. Both times, she elected not to attend. According to the terms of the
Ameritech Long Term Disability Plan:

       "A Disabled Eligible Employee will not be entitled to benefits if he or she declines
       to submit to such examination made by a physician chosen by the Committee, as
       the Company may deem necessary to ascertain the Eligible Employee's
       Condition."

Therefore, this claim for Long Term Disability benefits has been denied.

SEP 26 2001 10:23 FR SWBT EXEC CUST CONT 314 331 2444 TO 83128458871 P. 27. 28
FROM :STUART GALESBURG ATTY HI FAX NO. :847~982~0111 SEP. 25 2001 05:27PM P2
09/20/2001 02:24 7737748699 D PGPTM PAGE 01

As Ms. Sisto does not qualify for Long Term Disability benefits, she is also not entitled to medical benefits. If her long term disability benefits are subsequently reinstated, her medical coverage would also be reinstated. Should Ms. Sisto wish to appeal this decision, she may do so by submitting a written request for reconsideration, including any medical records or written statements which she or her health care provider feel support the presence of a totally disabling medical condition, within 60 days of receipt of this letter. Requests and supporting evidence should be submitted to:

SBC Quality Review Unit
PO Box 804778
Chicago, IL 60680-4778

If there are any questions, please call the SMAART at 1-888-212-3300 between 8 a.m. and 3 p.m., Central time, Monday through Friday.

Sincerely,

*Nina N. Bradley*

Nina N. Bradley
Long Term Disability Case Manager
SBC Medical Absence & Accommodations Resource Team

cc: Elvira Sisto

SEP 26 2001 10:23 FR SWBT EXEC CUST CONT   314 331 2444 TO 83128458871     P.28 28
FROM :STUART GALESBURG ATTY AT      FAX NO. :847-982-0111



**Rehabilitation
Institute of
Chicago**

**Center for
Pain Studies**

1030 North Clark Street
Suite 530
Chicago, Illinois 60610
312-238-7800
312-298-7801 Fax

3 April 2001

Mr. Stuart H. Galesburg
221 North Lasalle Street #2300
Chicago, Illinois 60601

Re: Elvira Sisto

Mr. Galesburg:

This is to provide you with a written summary of our telephone conversation yesterday.

I reviewed an extensive assortment of medical records, interviewed and examined Ms. Sisto on March 7, 2001. Based on that information, including an EMG/NCV of the upper extremities on 2/5/01 and an MRI of the cervical spine on 12/29/00, I would make no changes to my diagnoses of bilateral carpal tunnel syndrome, bilateral C7 radiculopathy, postural abnormalities, deconditioning and pelvic girdle muscle imbalance, as stated in our letter to Ms. Sisto dated March 14, 2001.

As the letter of 3/14/01 states, I maintain that she could "benefit from an interdisciplinary chronic pain management program if [she] can understand and accept realistic rehabilitation goals...". At the time of our evaluation, I did not believe Ms. Sisto entertained realistic pain management goals. In addition, if she or her treating physicians believe further workup and/or surgery is necessary, she would not be appropriate for interdisciplinary rehabilitation until that is accomplished. In any case, she will need to meet again with the evaluation team (medical and psychology) to review her goals prior to beginning treatment here.

Sincerely,

P. Michelle Muellner, MD
Attending Physician
Rehabilitation Institute of Chicago
Center for Pain Studies

cc: Betty Ouleserian, RN, MS

FOR SBC/ anen-stel

*An Academic Affiliate of Northwestern University Medical School*

*Exh.* 9

Sept 14,2001

Elvira A Sisto
Apt 12A
7171 W Gunnison St.
Harwood Hts, IL 60706

Grievance

I Elvira a Sisto would like to enter a formal grievance against
SBC/Ameritech, Sedgwick James, and my Local Union 21 for the following
reason.

On Oct. 27, 1999 I had fallen in the bathroom located on the second floor of
Chicago north office at 2401 Grace St. , Chgo. IL 60618. Where I was an
employee. I had injury my back, neck and leg. I was driven to the hospital
by my daughter Lisa on this day. I was off of work at this time until Jan.
2000. I was under doctors care not by my regular doctor because she was on
medical leave. I had gotten a call from Una Przell requesting that I return to
work but I couldn't understand why. She had told me that the doctor had me
realest which didn't make sense to me because I was in chronic pain and
had never been out of pain, and the doctor had me in theiropy still at this
time. I couldn't move and I was spending all of my day in bed. Una had told
me that if I didn't return to work on that following Monday that I would be
fire. So I did what she ask. I went to work each day in chronic pain . a few
of my co-workers asitied me during the day by getting me water. Helping
me with my coat caring my purse and so fourth. They help with everyday
little things. I'm giving you some background before I get into my grievance
so you can understand where I am coming from. Everyday my pain got
worst and my leg swelled three times its normal size. My doctor said that I
would have to be admitted into the hospital for fear of blood clots so on July
31,2000 was my last day of work. I even work overtime on this day. The
next day I was admitted to the hospital for chronic pain in my back, neck
and my leg I spent aprox 10days in there. I have two heritnated disc in my
Neck, back, which causes my leg to swell and hurt I have never been out of
the chronic pain yet, nor have I been back to work.

Exh. 10

Grievance #1≃ Workmen's Comp I was paid sick pay and not workmen's Comp. I question Una about this she told me that they had to make sure that my illness was from my fall and not that my diabetics didn't cause my

### Page 2

herniated disc. Because of sick pay taxes where taken out of my checks I was later put on workmen's Comp. But they need go back from day one and reimburst me for taxes and correct my w2 forms

#2≃ I can't not get a paycheck on time nor the correct amount. I have dir. deposit and sometimes my pay is in direct deposit and others went to my work place. I feel that I don't have to hunt down my pay each and every pay period and I fell that I don't have to keep calling to tell them that they have enter the wrong amount into my account. I have to call payroll and payroll doesn't take direction from me, they tell me that errors have accrued and that disca office have only approve for 40hrs and no pay 40hrs these are a few examples that have been going on for the last two years

#3≃ In May I receive a letter on Sbc letter head saying that on 08-05-2001 that I will be terminated due to my short term disa and that I maybe eligible for long term disca. I called all the numbers on the letter They are for Sedgwick James not for Ameritech I can't understand why Sbc allows Sedgwick James use and say that they are sbc when indeed they are not. I had called to see if this letter was sent to me in error. I was told no. I explained that I am not on short term but on workmen's Comp. I requested booklets to show me where is stated and explain what is short term disca and what is workmen's comp they told me that all they have is a script that they read I request a copy of that script. I was told no I ask who do you work for they told me SBC I ask who signs your paychecks I was told none of my business than I told them that you can't be SBC. I call the union got a record message left my name and number. I called Human resources got a recorder message , I called all the numbers that where given to me I got a recorded message. On this day I spent three hours speaking to recorded messages and no answers. I finally got a call back from our Union spoke with Maryjo she told me that I would have gotten these booklets when I first started back in 1997 I look for them. In these book there is not any

explanation of quaifcation for short term or long term just a general
description no where in my union book or these booklets say that you will
be fire because of injury on the job and that your benefits will be taken
away.

### Page 3

 I have spoken to Debbie Reader from long term disc office she told me to
fill out theses paper work so that there would not be a break in my benefits
so I did I fax her as well as prioity mail her the information that she had
requested. I get a call from Nina Bradley form long term disc office said that
she is my case mgmt and she alone with make the decision if I get long
term or not and only her. I ask what her back ground was if she had medical
back ground said no I ask what her quaifcation where she said that she was
trained on this job for this. I ask if their was a medical dept. with a
committee that looks over these medical records for long term she once
again stated that she is sole person who will make the decision I  was told
need medical records I had explain that Debbie Reader has them.( Debbie
Reader is also Nina's supervisor) She told me that she didn't care to resend
them. I come to find out that Una Prezell , Debbie Reader, and Nina Bradley
are all in the same office. How many times do I have to get medical records
why can't they go to that person and ask them for copies how hard could
that be. So again I sent them. Have an attorney he also ask  why I got this
letter and if it were a mistake Nina said No again Mr. Galesburg requested
Booklets Nina told Mr. Galesburg that she will send out booklets he never
receive it. Mr. Galesburg spoke with Todd Shivers Ameritech Attorney. He
address this and had sent a letter stating that I could not be fire because I
was on workmen's Comp this was igord. I receive a letter saying to report to
a doctor I called my atty. office I was told not to go no booklets where ever
given and that we didn't know their guidelines my atty. spoke with
Ameritech atty. he said same thing don't go so I did not go. I did tell nina
Bradley and the person who called to verify for me to go. My Atty. and Nina
Bradley came to agreement that I do not have to go if my doctor can answer
her question she had and sent her a report and a statement that I couldn't
work more than 1 hour a day I need surgery due to hernitated disc . On Sept
6th 2001 I got three prices of mail saying that sbc heath coverage. One was
conformation of health coverage and cobra. When calling Nina Bradley I
explain what I got and if this is an error she told me that I had been

terminated. I had ask had you not receive DR Wallners report she said yes
but didn't care what anyone said she told me that she was the sole person
who makes the decision if I get long term or not she said that because I
didn't go to the doctors that I was dein long term disca I explain that I
should not have been terminated due to workmen's

### Page 4

comp also ask why because she had agreement with Mr. Frank Soto atty. at
law said she didn't care and that she said that she turn down my long term
and that is that I ask for her to think about it said no she wants to play
hardball

#4=Union. On serval times I spoke with maryjo I explain about thing
going on she ask if I had atty. said I was force to because they where not
paying me correctly said that the union doesn't want to get involve with
attys. I ask her about booklets. I ask for help with getting correct w2 for
this year and for 1999 she said will look into it. I ask about my success
shares that I never receive was told that you need to work be on active
payroll for oct-nov-dec. I find it dumb that a person works seven Months
into that year and out due to injury doesn't get success shares she said that
will get back to me. No has not gotten back to me. When I call I get a
recording then a rep will return my calls and they don't know these answers.
I feel that this mess is growing and can't get fix. I pay union due just like
the next guy. I feel that my union should get off their duff and dust off their
clothes and roll up their sleeves and start fighting for my rights. As a union
member I have stood by your side so why can't you stand by me I need Help

**Thank You**

**Elvira A Sisto**
**id #E442620 Q07377**

cc: Stuart H. Galesburg
cc: Frank Soto

SBC Quality Review unit
P.O. Box 804778
Chicago, IL 60680-4778



October 15, 2001

Stuart H. Galesburg
221 N. Lasalle St., Ste. 2300
Chicago, IL 60601

Re:     Ameritech Sickness and Accident Disability Benefit Plan
        Claim Number: A125009544
        Your Client: Elvira Siston

Dear Mr. Galesburg:

This letter serves to acknowledge receipt of your client's request for appeal of benefits
denied under the Ameritech Sickness and Accident Disability Benefit Plan. The request
for appeal was received in the Ameritech Disability Service Center (ADSC) on
October 08, 2001.

The request for appeal of benefits denied will be reviewed by the SBC Quality Review
Unit and you will receive a written response by December 06, 2001.

Under the terms of Section 2, Paragraph 2.4 of the Sickness and Accident Disability
Benefit Plan, disability is defined, in part, "as a sickness or injury, supported by objective
medical documentation, that prevents the Eligible Employee from performing the duties
of his/her last Company or Participating Company-assigned job with or without
reasonable accommodation…" For this reason and because the decision of the Quality
Review Unit is final, this is your client's <u>final</u> opportunity (if your client has not already
done so) to submit any additional clinical documentation (diagnostic test results, lab
results, x-rays, doctor's office notes, etc.) that was not submitted with your client's
original claim by November 06, 2001.

Sincerely,

Ericka Ingersol
ERISA Appeal Specialist
SBC Quality Review Unit

cc: Elvira Siston

_appeal1a

Exh 11

SBC Quality Review unit
P.O. Box 304778
Chicago, IL 60630-4778



October 18, 2001

**Corrected letter to letter dated 10/15/01**

Stuart H. Galesburg
221 N. Lasalle Street, Ste. 2300
Chicago, IL 60601

Re:  **Ameritech Long Term Disability Plan**
     **Claim Number: A125009544**
     **Your client: Elvira Sisto**

Dear Mr. Galesburg:

This letter serves to acknowledge receipt of your client's request for appeal of benefits denied under the Ameritech Long Term Disability Plan. The request for appeal was received in the Ameritech Disability Service Center (ADSC) on October 08, 2001.

The request for appeal of benefits denied will be reviewed by the SBC Quality Review Unit and you will receive a written response by December 06, 2001.

Under the terms of Appendix A of the Long Term Disability Plan, disability is defined, in part, as "immediately following the Waiting Period, an illness or injury, other than accidental injury arising out of and in the course of employment by the Company, or a Participating Company, supported by objective medical documentation, that prevents the Eligible Employee from engaging in any occupation or employment (with reasonable accommodation as determined by the Company or its delegate), for which the Eligible Employee is qualified, or may reasonably become qualified, based on training, education or experience…" For this reason and because the decision of the Quality Review Unit is final, this is your client's final opportunity (if your client has not already done so) to submit additional clinical documentation (diagnostic test results, x-rays, doctor's office notes, etc.) that was not submitted with your
by November 06, 2001.

Sincerely,

Ericka Ingersol
ERISA Appeal Specialist
SBC Quality Review Unit

cc: Elvira Sisto

Exh H (a)

appeal4

# APPENDIX A

## DEFINITION OF DISABILITY FOR NON-SALARIED EMPLOYEES

"Disability" or "Disabled" immediately following the Waiting Period shall mean an illness or injury, other than accidental injury arising out of and in the course of employment by the Company, or a Participating Company, supported by objective medical documentation, that prevents the Eligible Employee from engaging in any occupation or employment (with reasonable accommodation as determined by the Company or its delegate), for which the Eligible Employee is qualified, or may reasonably become qualified, based on training, education or experience. An employee shall continue to be considered disabled if prevented by reason of such illness or injury, supported by objective medical documentation, from working at a job which pays wages which, when combined with benefits payable from the Plan, equal less than 75% of the Eligible Employee's Base Pay at the time the Disability occurred.





# LONG TERM DISABILITY PLAN

### (AS AMENDED AND RESTATED EFFECTIVE AS OF JUNE 1, 1996)

# Giri T. Greesan, M.D.

December 21, 2001

Mr. Stewart H. Galesburg

**RE: SISTO, Elvira**
**Date of Accident: October 27, 1999**

Dear Mr. Galesburg:

This is a summary on Ms. Elvira Sisto seen in our office initially on
May 1, 2001. Ms. Sisto came in with the complaints of pain in the neck
area, with radiation to the left shoulder area, the lower back area, with
radiation to the right posterior thigh, calf area, with severe midback pain
radiating circumferential around her chest area. Patient informed me that
she fell at work on October 27, 1999. She informed me that she went to the
bathroom and she didn't notice the water on the floor of the stall when she
started to slip. Patient informed me that she tripped forwards. Ms. Sisto
did not want to fall into the toilet bowel, so she shifted her weight
backwards. She informed me that her feet went from underneath her at that
point.

Past History
Past history indicated that patient has had gallbladder surgery in 1998,
carpaltunnel release in 1999, and back pain in October 27, 1999.

Clinical Examination
Clinical examination at that time revealed a 5'4" inches tall Caucasian
female who weighed 275 pounds. No cranial nerve paralysis was noted.
Cervical spine flexion was possible to around 15° extension to around 10°.
Side-to-side rotations were possible to around 30°. Examination of the
upper and the lower extremities revealed 5/5 strength and sensory
examination was normal. Deep tendon reflexes were equal in the upper and
the lower extremities. Straight leg raising was negative bilaterally.

Examination of the abdomen did not reveal any masses.

Examination of the spine in the standing position did not reveal any
deformity. Lumbosacral flexion was possible to around 30° extension to
around 10° and side bending to 15°.

676 North St. Clair Street
Suite 377
Chicago, Illinois 60611

Telephone 312.78Spine
312.787.7463
Facsimile 312.787.5835

*Ex h 12*

Page 2
December 21, 2001
Mr. Stewart H. Ginesburg
     **Re: SISTO, Elvira**

Radiological Studies
Review of the MRI of the cervical spine revealed an extruded disc at the C3-4 level, and at the C5-6 level more towards the right side.

The MRI of the thoracic spine area revealed the presence of a disc at the T5-6 level on the right side.

Diagnosis
Our diagnosis on Ms. Elvira Sisto based on the clinical examination and radiographic findings is that she had a herniated disc at the C3-4 and C5-6 level, accounting for the pain in the neck area, left shoulder area, upper extremity, and with a thoracic disc at the T6-7 level, accounting for the pain in the midback area, with radiation to the right lower extremity, aggravated as the result of a fall at work.

Patient has undergone an anterior cervical disectomy and interbody fusion on November 5, 2001 for a discectomy and fusion of the C5-6 level. Patient no longer has the pain in her upper extremities which she had prior to surgery. Patient is in a cervical orthosis and she will be in the orthosis for a period of three months from the time of her surgery. We will put her through a physical fitness program.

Regarding Ms. Sisto's lower back condition, we will certainly monitor her situation and decide on a treatment plan.

Prognosis is certainly guarded.

                 Sincerely,


                 GIRI T. GIREESAN, M.D.

GTG/jr



December 6, 2001                    **PRIVATE AND CONFIDENTIAL**

Stuart H. Galesburg
Attorney at Law
221 N. LaSalle St., Suite 2300
Chicago, IL 60601

Re:    Ameritech Long Term Disability Plan
       Claim Number: A125009544
       Your Client: Elvira Sisto

Dear Mr. Galesburg:

Your client's claim appealing the denial of benefits under the Ameritech Long Term
Disability Plan was reviewed by the SBC Quality Review Unit on November 29, 2001.

You were notified of your opportunity to provide any additional information on Ms.
Sisto's behalf. The Quality Review Unit reviewed all submitted material and information
regarding the denial of long term disability benefits by the SBC Medical Absence and
Accommodation Resource Team (SMAART) for your client's claim. After this review,
the Unit determined to uphold the denial of benefits based on the following: the long term
disability plan provides in Appendix A that a claim for long term disability must be
supported by objective medical documentation, that prevents the Eligible Employee from
engaging in any occupation or employment (with reasonable accommodation as
determined by the Company or its delegate), for which the Eligible Employee is
qualified, or may reasonably become qualified, based on training, education or
experience.

The medical records not relevant to the determination of long term disability benefits
were not considered in connection with this review. However, the Unit reviewed all of
the information contained in Ms. Sisto's long term disability claim file including, records
from Proficient Case Management, LLC dated from November 7, 2000 through May 17,
2001, an EMG/NCV report dated October 12, 2000 from Barbara A. Heller, D.O. at
Midwest Orthopaedics, a letter dated January 21, 2001 regarding a follow-up
appointment on January 13, 2001 from Charles M. Slack, M.D. at Midwest Orthopaedics,
test results of an MRA of the brain and an MRA of the carotid arteries in the neck dated
January 15, 2001 from Ruth G. Ramsey, M.D. at MRI of River North, a nerve conduction
studies and EMG report dated February 5, 2001 from Sandeep K. Aggarwal, M.D. at
Neurology Associates, LTD., an initial evaluation dated February 9, 2001 from an
appointment on February 5, 2001 with Elisabeth Waller, M.D., M.P.H., an independent
medical evaluation dated February 14, 2001 from Martin G. Luken III, M.D. at Chicago
Institute of Neurosurgery and Neuroresearch, a medical assessment dated March 7, 2001

_appeal11ca

*Exh. 13*

Elvira Sisto
December 6, 2001
Page 2

from P. Michelle Muellner, M.D. at Rehabilitation Institute of Chicago, a psychological assessment dated March 7, 2001 from Patricia A. Cole, PhD at Rehabilitation Institute of Chicago, a vocational assessment dated March 7, 2001 from Jennifer Barthel, M.S., C.R.C. at Rehabilitation Institute of Chicago, a letter dated March 14, 2001 from P. Michelle Muellner, M.D. summarizing the assessments of March 7, 2001 at Rehabilitation Institute of Chicago, a letter dated March 21, 2001 from Martin G. Luken III, M.D. at Chicago Institute of Neurosurgery and Neuroresearch, an evaluation dated May 1, 2001 from Giri T. Gireesan, M.D., a radiological report dated May 3, 2001 from the Department of Radiology at Northwestern Memorial Hospital, an office consultation and evaluation dated July 5, 2001 from George R. Cybulski, M.D., F.A.C.S., and a letter dated August 8, 2001 from Elisabeth Wallner, M.D., M.P.H. The Unit also reviewed your correspondence including a letter dated October 18, 2001 informing the Quality Review Unit that Ms. Sisto's social security benefits were approved and your October 6, 2001 appeal letter request.

The diagnostic test results did verify the presence of a medical condition, however functional limitations, restrictions, and Ms. Sisto's current work capacity were not documented.

Specifically, the February 5, 2001 nerve conduction studies and EMG report as interpreted by Dr. Aggarwal did verify bilateral carpal tunnel syndrome and chronic, mild, bilateral C7 radiculopathy with evidence of denervation on the left side. Dr. Aggarwal recommended treatment options based on these results but no documentation regarding Ms. Sisto's functional limitations were provided. Further, Dr. Aggarwal interpreted the results of the MRA of the brain and the MRA of the carotid arteries from January 15, 2001. Dr. Aggarwal documented the results indicated "about 30% stenosis of the left internal carotid artery which is rather insignificant."

According to the above referenced report, Ms. Sisto's treatment plan included an evaluation with Dr. Luken and an evaluation at a pain clinic. Dr. Luken completed an independent medical evaluation on February 14, 2001. Dr. Luken concluded that spinal surgical intervention was not necessary, although a referral to a pain management specialist was appropriate. Additionally, Dr. Luken documented that Ms. Sisto is "capable of some sort of gainful employment, and I (Dr. Luken) deferred comment regarding the extent of disability to a formal work capacity evaluation."

A thorough pain evaluation was completed at the Rehabilitation Institute of Chicago on March 7, 2001 consisting of a medical assessment, a psychological assessment, and a vocational assessment. In a summary letter dated March 14, 2001, Dr. Muellner concluded Ms. Sisto could benefit from an interdisciplinary chronic pain rehabilitation program if Ms. Sisto "can understand and accept realistic rehabilitation goals of some decrease in pain, increased function, a return to work, decreased dependence on the medical system, an improved medical regime and achieving maximum medical improvement" for her diagnosis.

_appeal11ca

Elvira Sisto
December 6, 2001
Page 3

According to Proficient Case Management records dated April 17, 2001, Ms. Sisto was scheduled to begin pain rehabilitation at Rehabilitation Institute of Chicago on April 9, 2001. Ms. Sisto delayed treatment pending a second opinion with Dr. Cybulski. No records have been submitted to verify Ms. Sisto's treatment at Rehabilitation Institute of Chicago.

Prior to the evaluation with Dr. Cybulski, Ms. Sisto was evaluated by Dr. Gireesan on May 1, 2001. Upon evaluation, Dr. Gireesan documented decreased range of motion of the cervical and lumbosacral spine. Additionally, Dr. Gireesan documented strength in the upper and lower extremities as 5/5, a normal sensory exam, deep tendon reflexes were equal in the upper and lower extremities, and the straight leg raising test was negative bilaterally. Dr. Gireesan documented Ms. Sisto was a candidate for surgery once her diabetes and hypothyroidism were in control. Current treatment recommendations included cardiovascular conditioning, general strengthening, and a stretching program. Dr. Gireesan concluded Ms. Sisto was not able to work, however Dr. Gireesan did not document any clinical findings or functional limitations preventing Ms. Sisto from working in a sedentary job.

The consultation and evaluation with Dr. Cybulski was completed on July 5, 2001. Upon evaluation, Dr. Cybulski documented full range of motion of the neck, a negative Spurlings maneuver, and the absence of spasm in the back and shoulders. Further, Dr. Cybulski documented normal tone bilaterally in the upper and lower extremities, full strength bilaterally in the upper and lower extremities, and intact sensation without paresthesia. Dr. Cybulski did not document a treatment plan, recommendations regarding Ms. Sisto's ability to work, or any functional limitations or restrictions. Dr. Cybulski did document a plan to discuss his findings with Dr. Gireesan, however no additional medical documentation was submitted by Dr. Cybulski or Dr. Gireesan for review.

The remaining medical documentation consisted of a letter from Dr. Wallner dated August 8, 2001. Dr. Wallner documented that Ms. Sisto's diabetes, obesity, and hypothyroidism are difficult to control due to Ms. Sisto's inability to exercise. Dr. Wallner concluded that Ms. Sisto is not exercising secondary to back pain. Additionally, Dr. Wallner documented Ms. Sisto's report that she is unable to sit for more than one hour and she is unable to write or manipulate objects for more than one hour because of constant pain. Dr. Wallner did not document that Ms. Sisto's medical conditions of diabetes and hypothyroidism are preventing a return to work or that Ms. Sisto has any functional limitations or restrictions because of these conditions.

Since the medical documentation submitted contained limited clinical findings and the absence of functional limitations, restrictions, and current work capacity, the long term disability case manager arranged a functional capacity evaluation with a physiatrist to assess Ms. Sisto's current level of functioning and work capacity. Unfortunately, Ms. Sisto did not comply with the request for a functional capacity evaluation. Thus a second functional capacity evaluation was scheduled and again, Ms. Sisto did not comply with the request. According to the terms of the Ameritech Long Term Disability Plan:

Elvira Sisto
December 6, 2001
Page 4

> "A Disabled Eligible Employee will not be entitled to benefits if he or she declines to submit to such examination made by a physician chosen by the Committee, as the Company may deem necessary to ascertain the Eligible Employee's Condition."

Moreover, Ms. Sisto was notified in writing that "failure to show up for this examination will result in denial of your Long Term Disability Benefits."

The medical evidence does verify the presence of multiple medical conditions and the need for treatment, however the medical information provided does not verify Ms. Sisto's inability to perform any occupation.

Although some findings on examination are evident, none are documented to be so severe as to prevent your client from working at any occupation or employment for which your client is qualified or may reasonably become qualified based on training, education and experience from August 6, 2001.

Moreover, it is questionable if Ms. Sisto is entitled to long term disability benefits pursuant to the provisions of the Ameritech Long Term Disability Plan.

Under the terms of the Ameritech Long Term Disability Plan the decision of the Unit is final. We regret the outcome could not be more favorable to your client.

Sincerely,

Allison Langerman, RN
Clinical Appeals Specialist
SBC Quality Review Unit

cc: Elvira Sisto

_appeal11ca

# Using The Ameritech
# Non-Management Disability Plans



Exh. 19

# Using This Handbook

The disability benefits provided by the Ameritech Disability Plans (or "the Plans") are designed to help provide financial protection and security for you and your family if you should become disabled during your career with the Company. The Plans provide income for short- and long-term periods of disability at no cost to you.

This is a guide to using the Ameritech Disability Plans, which include the Ameritech Sickness And Accident Disability Benefit Plan and the Long Term Disability Plan. It is set up so you can find the answers to your questions quickly. In the next sections, you'll find two helpful guides: "Finding The Information You Need" and "What You Need To Know About The Plans." "Finding The Information You Need" will tell you where you can find detailed information about the Plans. "What You Need To Know About The Plans" will highlight important Plan basics.

There are other easy ways for you to find information. Throughout this handbook, you'll find icons that identify important Plan information, including definitions, examples, and important facts. The following legend shows you what each icon represents:

 Defines words and concepts that are important to the Plans

 Shows examples that can help you understand how the Plans work

 Calls your attention to information that you may not know about the Plans

 Indicates information to which you should pay special attention

 Explains where you can call if you have questions about the Plans

1

# Finding The Information You Need

**Using This Handbook** . . . . . . . . . . . . . . . . . . . . . . . . . 1

**What You Need To Know About The Plans** . . . . . . . 4

**Using The Ameritech Disability Plans** . . . . . . . . . 7

Who Is Eligible For Coverage? . . . . . . . . . 7
How To Enroll . . . . . . . . . . . . . . . . . . . . 7
When Coverage Begins . . . . . . . . . . . . . . . 7
When Coverage Ends . . . . . . . . . . . . . . . 7

**How The Sickness And Accident Disability Benefit Plan Works** . . . . . . . . . 8

Your Sickness Disability Benefits . . . . . . . . 8
Your Accident Disability Benefits . . . . . . . 10
If You Anticipate A Disability . . . . . . . . . 15

**How The Long Term Disability Plan Works** . . . . . 16

Benefits Provided By The Plan . . . . . . . . . 16
How Long You Receive LTD Benefits . . . . 17
Qualifying For Benefits . . . . . . . . . . . . . . 17
When The Plan Does Not Pay Benefits . . .17
Continuation Of Coverage Under
Other Company-Sponsored Plans . . . . . . .18
Your Employment Status
When Receiving LTD Benefits . . . . . . . . .18

**Social Security Disability Benefits** . . . . . . . . . . . 19

**How To File A Claim** . . . . . . . . . . . . . . . . . . . . . . . 20

**What To Do If You Become Disabled
(Checklist)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## How Do The Plans Work?

Sickness Disability benefits provide all or half of your pay, depending on your length of employment with the Company, for up to 52 weeks. To qualify, you must be disabled for seven consecutive days (including weekends and scheduled days off) due to an *off-the-job* illness or injury.

Accident Disability benefits will provide you with full pay for up to 52 weeks, depending on your length of employment. Once full pay is no longer available, the Plan will provide half pay for as long as you remain disabled. To qualify, you must be disabled due to an *on-the-job* illness or injury. See the next question for details on how the Plan coordinates benefits with Workers' Compensation.

LTD benefits begin if you are still disabled due to an off-the-job illness or injury after you have exhausted Sickness Disability benefits. The Plan works with other sources of disability income to provide you with half of your pre-disability pay. To qualify for LTD benefits, you must be disabled according to the definition of disability found in the "How The Long Term Disability Plan Works" section.

## How Will Receiving Workers' Compensation Affect The Accident Disability Benefits I Receive?

If you qualify to receive Accident Disability benefits, you may also qualify to receive Workers' Compensation benefits according to state statutes.

In such cases, the payment of Accident Disability and Workers' Compensation benefits will be coordinated. See the "Coordinating Benefits With Workers' Compensation" section for details.

## When Can I Receive Benefits From The Plan?

You can begin receiving Sickness Disability benefits after you are disabled for more than seven consecutive days (including weekends and scheduled days off) as a result of an off-the-job illness or injury.

You can begin receiving Accident Disability benefits on the first full day of your absence due to a disability resulting from an on-the-job illness or injury.

You can begin receiving LTD benefits after you have been disabled for the 52-week period during which Sickness Disability benefits are payable.

For both Plans, receipt of benefits is dependent on completing the benefit application process. You will not automatically receive benefits if you do not complete this process. See the "Qualifying For Benefits" section for details.

5

# Using The Ameritech Disability Plans

## Who Is Eligible For Coverage?

You are eligible for Sickness And Accident Disability Benefit Plan and Long Term Disability (LTD) Plan coverage if you are a regular full-time or part-time employee of an Ameritech company that has adopted the Plans.

## How To Enroll

You do not have to enroll to be eligible for disability benefits. You are automatically enrolled as of the date you become eligible for coverage under each Plan.

## When Coverage Begins

Your coverage for Accident Disability benefits begins on your first day of work with the Company.

Coverage for Sickness Disability and LTD benefits begins after you have completed six months of employment as shown by the records of the Company.

If you are on a leave of absence on the date you would otherwise become eligible for coverage, coverage will begin after you return to work and fulfill the six-month eligibility requirement. Time you may spend on a leave of absence does not count toward the six-month

eligibility requirement. If you are on an Anticipated Disability leave of absence (see the "If You Anticipate A Disability" section), coverage will begin when your certified disability begins, if you are otherwise eligible.

**Please note: You cannot receive Sickness Disability and LTD benefits at the same time.**



## When Coverage Ends

Your coverage under the Sickness And Accident Disability Benefit and LTD Plans ends on the first to occur of the following:

- your employment ends for any reason, including your death (does not apply to LTD coverage if employment ends because of receipt of LTD benefits)
- you are no longer eligible for coverage (see the "Who Is Eligible For Coverage?" section)
- the Plan terminates



## EXAMPLE 1

**Determining Angela's Sickness Disability Benefits**

Angela has worked for the Company for 12 years. She becomes ill and is absent from work from December 1 until December 22. She becomes eligible for benefits on December 8, the eighth continuous day of her absence. Because Angela has 12 years of service, she receives full-pay Sickness Disability benefits for the two weeks she is gone after qualifying for benefits.

Angela returns to work on December 22. Beginning January 23, she is absent from work again as a result of her previous illness. Because she had been back at work for more than two weeks, her benefits do not begin until the eighth day of her second absence. On January 30, Angela begins receiving full-pay benefits and is eligible for up to 11 weeks of full-pay benefits (13 weeks minus the two weeks she received during her previous period of disability). She returns to work on March 29, having received full pay for her entire eight-week absence.

After returning from her second absence, Angela becomes disabled again on April 12 due to her original illness. Because she becomes disabled before 13 weeks have elapsed, the benefits she received during her first two absences count when determining the benefits she is eligible to receive. Therefore, she is eligible for up to three weeks of full pay (13 weeks minus the 10 weeks she received during her two previous periods of disability) and then half pay for the next 39 weeks as long as she is considered disabled.

Angela is eligible for the following disability benefits during each absence:

Absence #1 =   2 weeks of disability benefits at full pay
Absence #2 =   8 weeks of disability benefits at full pay
Absence #3 =   3 weeks of disability benefits at full pay, and up to 39 weeks of benefits at half pay
Total      =   13 weeks of full-pay disability benefits and up to 39 weeks of half-pay disability benefits

---

### Angela's First Absence

| | **2 weeks full benefits** | |
|---|---|---|
| **Dec 1**<br>Absence<br>begins | **Dec 8**<br>Benefits<br>begin | **Dec 22**<br>Returns to<br>work—<br>benefits end |

### Angela's Second Absence

| | **8 weeks full benefits** | |
|---|---|---|
| **Jan 23**<br>Absence<br>begins | **Jan 30**<br>Benefits<br>begin | **March 29**<br>Returns to<br>work—<br>benefits end |

### Angela's Third Absence

| | **3 weeks full benefits** | **Half benefits** |
|---|---|---|
| **April 12**<br>Absence<br>begins | **April 19**<br>Benefits<br>begin | **May 10**<br>Half benefits begin<br>and last up to<br>39 weeks (as long<br>as disabled) |

*Benefits For Total Disability*

You will receive benefits for a total dis-ability if you are completely disabled as a result of an on-the-job illness or injury. Benefit payments for a total disability start on the first full day of your absence. The amount paid depends on your base pay rate and your length of employment on the day your disability absence starts.



**You are considered totally disabled if you are completely unable to perform your regular job as a result of an illness or injury caused by, and in direct connection with, the performance of an assigned duty in the Company.**

You will receive Accident Disability benefits equal to your full or half pay according to the schedule at the bottom of the page. Refer to the "Coordinating Benefits With Workers' Compensation" section for details on how the Plan pays benefits when you also receive Workers' Compensation.

If you return to work for fewer than 13 continuous weeks after your original disability absence, and are absent again due to the same on-the-job illness or injury, you receive full-pay benefits for the number of remaining weeks to which you were entitled.

If you become disabled again due to a *different* on-the-job illness or injury, any benefits you previously received are not counted in determining the duration of your full-pay benefits.

## Total Accident Disability Benefits

| If, on the day your Accident Disability benefits start, you were employed for . . . | You'll receive full pay up to . . . | After your full-pay period is over, you'll receive half pay . . . |
|---|---|---|
| up to 15 years | 13 weeks | |
| at least 15 years but less than 20 years | 26 weeks | as long as you remain totally disabled |
| at least 20 years but less than 25 years | 39 weeks | |
| at least 25 years or more | 52 weeks | |

*Benefits For Partial Disability*

You will receive benefits, up to six years, for a partial disability if you are unable to fully perform your job (or another Company job for which you are qualified) due to an on-the-job illness or injury. Accident Disability benefits will make up for all or part of the loss of pay between:

- your rate of pay as a full-time or part-time employee at the time you are declared partially disabled by the Employees' Benefit Committee or its delegate; and
- the wages the Employees' Benefit Committee or its delegate determines you are capable of earning while partially disabled.

 You are considered partially disabled if you are unable to fully perform your regular job as a result of an illness or injury caused by, and in direct connection with, the performance of an assigned duty in the Company.

Accident Disability benefits you receive while partially disabled are offset by any Workers' Compensation benefits you receive. See the "Coordinating Benefits With Workers' Compensation" section for information on how your partial disability benefits will be coordinated with any other benefits you are receiving.



**EXAMPLE 2**

**Determining The Length Of Samuel's Accident Disability Benefits**

As a result of an on-the-job injury, Samuel is totally disabled and unable to work. Samuel has 18 years of service at the time he is injured, so he is eligible to receive his full pay for up to 26 weeks (see the chart on page 11). After receiving 10 weeks of full-pay disability benefits, he is no longer disabled and returns to work.

Unfortunately, within two weeks of returning to work, he is again disabled and unable to work as a result of the original injury. Because he had returned to work for less than 13 weeks, the length of his first absence is counted when determining the number of weeks for which he is eligible to receive full-pay benefits. Therefore, he is eligible to receive full-pay benefits for 16 more weeks (26 weeks minus the 10 weeks he received during his first absence).

After 16 weeks, Samuel is still disabled. He is then eligible to receive half-pay benefits as long as he remains totally disabled.

13

- place yourself under a physician's care, be following a treatment plan reasonably designed to result in your recovery and return to work, and, as requested by the Disability Service Center, furnish medical evidence of your disability from your physician (the Company will provide forms for this certification, which must be completed and returned with all applicable medical records); and
- obtain permission from your physician as well as from the Ameritech Disability Service Center if you plan overnight travel away from your home at any time during your absence.

**If You Anticipate A Disability**

If you anticipate an absence due to a disability (e.g., pregnancy, elective surgery) and you want to take a leave of absence, you must apply to the Ameritech Occupational Medicine Department—Leaves of Absence for the unpaid leave that then may be granted. The leave of absence can be up to six months in length, and is granted for the time period immediately preceding the disabling event. Once the period of disability begins, you may begin receiving paid Sickness Disability benefits provided you have at least six months of employment with the Company and meet the Plan requirements.

For more information about the Anticipated Disability Program, contact the Ameritech Occupational Medicine Department—Leaves of Absence.



**DID YOU KNOW . . .**

*. . . you may apply for a leave of absence if you anticipate a period of disability for which medical treatment has been scheduled, such as elective surgery or pregnancy? The unpaid leave may be up to six months long. Once the period of disability begins, you may begin receiving Sickness Disability benefits if you are eligible and meet the requirements.*

## How Long You Receive LTD Benefits

The length of time LTD benefits are payable depends on your age at the time of disability:

| If your age when your disability starts is ... | The maximum LTD benefit period* is ... |
| --- | --- |
| age 61 or younger | up to age 65 |
| 62 | 3-1/2 years |
| 63 | 3 years |
| 64 | 2-1/2 years |
| 65 | 2 years |
| 66 | 1-3/4 years |
| 67 | 1-1/2 years |
| 68 | 1-1/4 years |
| 69 or over | 1 year |

\* *Includes 52 weeks of Sickness Disability benefits under the Sickness And Accident Disability Benefit Plan.*

LTD benefits will end if you die or are no longer disabled.

## Qualifying For Benefits

To qualify for LTD benefits, you must:
• complete and return the proper application when sent to you by the Ameritech Disability Service Center
• report for any medical examinations by a physician designated by the Ameritech Disability Service Center when requested

## When The Plan Does Not Pay Benefits

The Plan does not pay LTD benefits for disabilities caused by the following:
• your commission of a felony
• military service
• war or any act of war, declared or undeclared
• active participation in a riot, insurrection, rebellion, or civil commotion
• intentionally self-inflicted injuries

The Plan will also not pay LTD benefits for any period during which you are not under the care of a licensed physician, you refuse to provide information concerning your disability, or you refuse to be examined by a physician designated by the Ameritech Disability Service Center.

17

# Social Security Disability Benefits

Social Security also may provide you with disability benefits, if you qualify. These benefits combine with your benefits under the Sickness And Accident Disability Benefit and LTD Plans.

You and the Company share the cost of Social Security by paying taxes on your earnings covered under law.

Social Security benefits are not paid automatically. You must apply for them in all cases. For more information about your Social Security benefits, contact your local Social Security office. You will find the address in the telephone book under "United States Government."

 **DID YOU KNOW . . .**

*. . . once your Social Security disability benefit is initially determined, it remains the same for purposes of calculating your LTD benefit? This means that if your Social Security payments increase while you are receiving LTD benefits, your monthly LTD benefit will not be reduced. Any increases mean additional income to you.*

19

# What To Do If You Become Disabled (Checklist)

Knowing what to do if you should become disabled can help ensure that you receive the benefits for which you are eligible in a timely manner. By following the steps outlined below, you and your dependents will be able to receive the financial protection needed in the event that you are unable to work.

## If you are disabled due to an on-the-job illness or injury . . .

☐ Report the on-the-job illness or injury to your supervisor as soon as it occurs.

☐ Complete form AM974—Employee Statement of Illness/Injury and submit it to the Ameritech Disability Service Center.

☐ Place yourself under a qualified physician's care and follow a recommended treatment plan reasonably designed to result in your recovery and return to work.

☐ Complete the top portion of the medical release form AM975—Attending Physician's Report of Illness/Injury.

☐ Ask your attending physician to complete the remainder of form AM975 at the time of initial treatment and to provide documentation of your illness or injury by including applicable medical records.

# MEMORANDUM OF AGREEMENT
## AMERITECH SUCCESS SHARING PLAN
### FOR
### UNION REPRESENTED EMPLOYEES

### Section 1 - Plan Purpose

The Company and the Union recognize the mutual desire for, and benefit from, an all employee entrepreneurial commitment to the service oriented, efficient and profitable operation of the business in order to assure the Company's continued success. Accordingly, the Ameritech Success Sharing Plan (hereinafter the Plan) is designed to recognize and reward eligible employees when the Company successfully exceeds its annual financial objectives. Employees who by their efforts have contributed to the Company's success, will share financially in that success for Plan years 1998, 1999, 2000, 2001, 2002 and 2003 by being granted shares of Ameritech common stock.

### Section 2 - Plan Component

**Company Financial Objective**

Plan payouts to employees of Ameritech common stock will be based on the Company exceeding the official Ameritech Corporate net income objective for each Plan year, as approved. The official net income result for each Plan year will be as certified by an independent auditing firm and announced by the Company.

### Section 3 - Plan Year

The Plan year for measuring Company financial results and employees' eligibility to share in the distribution of profits through the receipt of Ameritech common stock shall be the calendar year for each of the applicable Plan years.

### Section 4 - Eligibility

To be eligible to participate in the Plan, an individual must be a regular or regular limited term full or part-time employee who works for a minimum of three (3) months within the applicable Plan year in a position covered by the Company's Collective Bargaining Agreement, and who:

   (a) Is on the Company's active payroll on December 31 of the applicable Plan year; or

### Section 5 - Definitions and Calculations

   (a) Time on the active payroll - For eligibility purposes (Section 4) an employee is considered on the active payroll of the Company except when on disability, leave of absence, work stoppage, layoff or suspension.

   (b) Full-time employee - One who is normally scheduled to work forty (40) hours per calendar week.

   (c) Part-time employee - One who is normally scheduled to work less than forty (40) hours per calendar week.

   (d) Full-time or part-time employee status - For Plan award eligibility purposes, an individual will be considered full or part-time based on their status as of the last date in the Plan year they are an active employee in a Union represented job.

   (e) Plan payout awards - Full shares of Ameritech common stock equal to the gross dollar amounts provided for in the following matrix minus all appropriate federal, state and local income tax, FICA withholdings and other appropriate deductions.

   (f) GROSS DOLLAR AMOUNTS FOR STOCK GRANT CALCULATIONS

**Percent Financial Objective Attained**

| 101.9 & Below | 102- 102.9 | 103- 103.9 | 104- 104.9 | 105- 105.9 | 106- 106.9 | 107+ |
|---|---|---|---|---|---|---|
| $300 | $500 | $700 | $900 | $1100 | $1300 | $1500 |

Note: No interpolation between points or rounding involved; e.g., 101.9 to 102 pays out at 101.9.



28

## ARTICLE 3

## NON-DISCRIMINATION

3.01    In a desire to restate their respective policies, neither the Company nor the Union shall unlawfully discriminate against any employee because of such employee's race, color, religion, sex, age, sexual orientation or national origin, or because the employee is an individual with a disability, a disabled veteran, or a veteran of the Vietnam era or other protected classification recognized by applicable Federal, State or local law.

3.02    The use of the masculine or feminine gender, or any titles which connote gender in this Agreement, shall be construed as including both genders and not as a sex limitation.

3.03    When a word is used in the singular or plural number, either number, the singular or plural of that word, shall apply.

## ARTICLE 4

## COMPANY - UNION RELATIONSHIP

4.01    The Company and the Union recognize that it is in the best interests of both Parties, the employees and the public that all dealings between them be, and continue to be, characterized by mutual responsibility and respect. To insure that this relationship continues and improves, the Company and the Union, and their respective representatives at all levels, shall apply the terms of this Agreement fairly, in accord with its intent and meaning and consistent with the Union's status as exclusive bargaining representative of all employees in the Unit. Each party shall bring to the attention of all employees in the Unit, including new hires, that their purpose is to conduct themselves in a spirit of responsibility and respect for the measures they have agreed upon to insure adherence to this purpose.

## ARTICLE 5

## NO STRIKE

5.01    It is understood between the Parties that the services to be performed by the employees covered by this Agreement are essential to the operation of the Company and to the health, safety, and welfare of the public, and the Union agrees that it will not authorize or promote any strike or slowdown during the life of this Agreement. The Company agrees that it will not intentionally do anything to prevent the performance of the said services by the said employees insofar as the services are required in the operation of the Company's business.

5.02    Should any such employee engage in any strike or slowdown, without the authority and not as the result of the call of the Union, the Parties shall cooperate to enable the Company to carry on its operations without interruption or other injurious effect. It is understood that the Union will not condone participation in a sympathy strike in conjunction with any other personnel of any other employer. Such cooperation on the part of the Union shall include ordering the employees to desist from such strike or slowdown.

5.03    This Article is not intended to prohibit employees from honoring a picket line provided that the establishment or maintenance of said picket line is not a violation of any law.

## ARTICLE 6

## UNION SECURITY

6.01    Each employee, who is a member of the Union or who is obligated to tender to the Union amounts equal to periodic dues on the effective date of this Agreement, or who later becomes a member of the Union and all persons becoming employees on or after the effective date of this Agreement, shall, as a condition of employment, pay or tender to the Union amounts equal to the periodic dues applicable to members, for the period from such effective date or, in the case of persons becoming employees after the effective date of this Agreement, on or after the thirtieth (30th) calendar day of employment, whichever of these dates is later, until the termination of this Agreement.

Exhibit

29

13.07 The Parties agree to work together to provide reasonable security for the safety of Board participants when either party determines that a need for such security exists.

13.08 If after the meeting of the Board the Company dismisses the employee, any grievance involving the dismissal shall be deemed withdrawn thirty (30) calendar days after the date of dismissal unless the Union elects:

(A) To advance the matter to impartial arbitration as provided in "Arbitration" following, if the employee was present at the Board meeting; or

(B) To advance the matter to Step 3 of the grievance procedure as provided in "Grievance Procedure" following, if the employee was not present at the Board meeting.

**Grievance Procedure**

13.09 In the event that the Union provides the Company with notification of a desire to hold a Union - Management Review Board and no meeting is held, the Union will be notified within fifteen (15) days from the original notification of contemplated dismissal, that, either the employee is being dismissed or that circumstances warrant further investigation. If the employee is so dismissed, the Union may appeal the dismissal under the grievance procedure provided in "Grievance Procedure" following.

13.10 Should differences arise between the Company and the Union regarding the interpretation or application of any of the terms or provisions of this Agreement or should any other grievance or dispute appear, such matters shall be processed according to the grievance procedures set forth in this Section. The Company and the Union recognize and confirm that the grievance procedures set forth in this Section, and, where applicable, "Arbitration" and "Expedited Arbitration" set forth in the Sections following, provide for the mutually agreed upon and exclusive forums for resolution and settlement of employee disputes during the term of this Agreement. Neither the Company nor the Union, its Locals or Representatives, will attempt either directly or indirectly by means other than the grievance, arbitration and/or expedited arbitration procedures to bring about the resolution of any issue which is properly a subject for disposition through such procedures. It shall be the objective of both the Company and the

42

Union to settle any grievance promptly and at the lowest step of the grievance procedure.

13.11 Discussion or Settlement of Grievance:

(A) Any individual employee or group of employees shall have the right to present grievances to the Company and such grievances may be settled without the intervention of the Union, so long as the settlement is not inconsistent with the terms of this Agreement and provided that the Union has been given an opportunity to be present at such settlement. After an employee has referred a grievance to the Union and the Union representative has so informed the Company that the Union represents the employee, the Company shall not discuss or settle such grievance directly with said employee initiating the grievance unless a Union representative is given an opportunity to be present.

(B) The grievance procedure shall consist of three steps:

Step 1 - A grievance shall be presented to the management representative to whom the aggrieved employee or affected employee group directly reports. It is intended that a grievance at this step shall be handled on an informal basis and verbal notice of the grievance shall be sufficient.

Step 2 - A grievance appeal shall be made to the next higher level management representative or other designated representative of the organization to which the aggrieved employee or affected employee group directly reports.

Step 3 - Notice of a further appeal shall be made in writing to the appropriate Labor Relations Director or other designated Labor Relations Representative.

(C) Any resolution of a grievance at Step 1, 2 or 3 shall be final and binding for the particular grievance involved, however, a resolution at Step 1 shall not be used as a precedent by either party.

Exh 17

43

13.12 Time and Method for Filing Grievances and Appeals:

(A) No grievance or appeal shall be heard by the Company unless the same has been timely and properly filed as follows:

(1) A grievance must be presented by the Union at Step 1 within thirty (30) days (180 days if the facts relevant thereto are a matter of Company record) of the action (or failure to act) which is the subject of the grievance.

(2) In the event the grievance is not resolved at Step 1 and the Union wishes to further appeal, such appeal must be made by the Union at Step 2 within thirty (30) days of the receipt of the Company's decision at Step 1.

(3) In the event the grievance is not resolved at Step 2 and the Union wishes to further appeal, such appeal must be made by the Union in writing at Step 3 within thirty (30) days of the receipt of the Company's decision at Step 2.

(4) In the event the Union fails to advise the Company of its decision to appeal within the thirty (30) day time limit described in A (1), A (2) or A (3) above, the Company's decision will stand and the grievance considered closed.

(5) Time limitations set forth in this Section may be extended upon mutual consent of both Parties.

(B) At any step of the grievance procedure, the Union representative shall set forth the identity of the aggrieved employee involved, a statement of the act or occurrence complained of and the date thereof, the provision of this Agreement alleged to have been violated, and the remedy requested. At Step 3, the Union will send a letter of confirmation to the appropriate Labor Relations Director stating the grievance number, the nature of the grievance; the date, time and location of the action (or failure to act); and the Union representative involved. At Step 3, the Company will provide the Union with a written response to the Union's appeal.

(C) The decision of the Company at Steps 1, 2 and 3 shall be given to the Union within fourteen (14) days of the close of the grievance meeting, or within a mutually agreed upon later date. Where no decision by the Company is received by the Union within the

44

time period described herein, the grievance shall be considered denied by the Company.

(D) Upon mutual agreement of the Parties, any single grievance may initially be heard at the third step of the grievance procedure without having been heard at either Step 1 or 2, however, in no event shall Step 3 be omitted or bypassed.

13.13 Grievance Meetings:

(A) A meeting at any step of the grievance procedure shall be held promptly and not later than fourteen (14) days after presentation of the grievance or notice of appeal unless the Parties mutually agree to a later date. A meeting at any step of the grievance procedure may be recessed and reconvened at a later date if the Parties mutually agree.

(B) In the absence of agreement for such later or continued date, if such meeting is not held within fourteen (14) calendar days, the grievance shall be considered denied by the Company as of the fourteenth calendar day. The Union may then appeal the grievance to the next step of the grievance procedure.

(C) All meetings will be held within the geographical jurisdiction of the bargaining unit at a mutually agreed time and place.

13.14 Union Representation:

The Union agrees to limit the number of Union representatives and aggrieved employees conferring and negotiating employee grievances with Company representatives, as provided in this Section, to those provided below, except that one (1) additional Union representative may be present, when unusual circumstances warrant, and the Union notifies, in advance, the Company representatives at whose level the grievance is being heard:

(A) Not more than three (3) Union representatives if conferring with a Company representative at Step 1, Step 2 and Step 3.

(B) The aggrieved employee or employees, as may be jointly agreed to by the Union and the Company representatives at whose level the grievance is being heard.

45

### 13.15 Cooperation and Notification:

(A) Each party recognizes the right of the other to investigate the circumstances surrounding any grievance or accident and agrees to cooperate with the other in such investigations.

(B) The Company and the Union shall keep each other informed regarding the personnel who are authorized to represent them in grievance and accident investigations.

### Arbitrable Topics

13.16 The right to invoke arbitration shall extend only to matters which involve:

(A) The interpretation or application of any of the terms or provisions of this Agreement, unless excluded by specific provisions of this Agreement.

(B) The discipline of an employee with six (6) or more months of Net Credited Service.

### Arbitration

13.17 An arbitrable matter shall be submitted to arbitration at the request of either party, provided the party seeking arbitration has notified the other party, by letter, within thirty (30) calendar days of the date of the final decision rendered at Step 3 under the grievance procedure or following a Union - Management Review Board dismissal, of its desire for arbitration.

13.18 Within seven (7) working days of the Company's receipt of the Union's request for arbitration, the Parties will select an arbitrator by alternately striking names from a randomly assigned "panel" of arbitrators. The method for determining which party will strike first shall be by flip of a coin. There will be thirty (30) such "panels" each consisting of seven (7) arbitrators who are members of the National Academy of Arbitrators and who have been selected to serve on a "panel". The panels will be created by both Company and Union each submitting one hundred and five (105) names. The Company and Union will make blind selections from the pool. The first seven (7) names will comprise Panel 1, and so on for each subsequent panel until all two hundred and ten (210) names are used. In the event an arbitrator is selected from each of thirty (30) panels, the 210 names will be

46

reordered in a random manner for the creation of thirty (30) new panels. The selected arbitrator shall conduct an appropriate hearing concerning the grievance, and render a decision, thereby resolving the grievance. The number of panels provided for in this paragraph may be increased by mutual agreement.

13.19 Hearings shall commence as quickly as possible following the designation and availability of the arbitrator and shall be carried to conclusion without unnecessary delay. The Company and the Union shall attempt to agree upon and reduce such issue or issues to writing at or before the commencement of the hearings. The hearing and decision of the arbitrator shall be confined to the issue or issues presented and the arbitrator shall not, as part of any decision, impose upon the Parties any obligation to arbitrate a subject which has not been agreed upon in this Agreement as a topic for arbitration.

13.20 The arbitrator shall render the decision in writing within thirty (30) calendar days following receipt of the Parties' briefs and the record in the case is closed. The award of the arbitrator shall be final and binding upon the Parties, subject to law, and the Company and the Union agree to abide by the decision of the arbitrator.

13.21 A grievance which the Union has elected to submit to arbitration under the provisions of this Section will be deemed to have been withdrawn if not submitted for final decision and processed within the time limitations prescribed in this Section. The time limitations set forth in this Section may be extended by mutual agreement.

13.22 The arbitrator shall have no authority to add to, subtract from, or change any of the terms of this Agreement.

13.23 The compensation and expenses of the arbitrator and the general expenses of the arbitration such as transcripts, hearing rooms, etc., shall be shared equally by the Company and the Union. Each party shall bear the expense of its representatives and witnesses.

13.24 In no event shall any retroactive pay treatment extend beyond thirty (30) days (180 days if the facts relevant thereto are a matter of Company record) prior to the date of notice of the grievance appeal in Step 2 of the grievance procedure. Any retroactive pay accorded shall be reduced or offset by all interim earned income, unemployment compensation, termination pay (or similar allowances paid pursuant to any provisions of an applicable agreement or established plan) or disability or pension benefits.

47

(C) The hearing shall be informal without formal rules of evidence and without a transcript. However, the umpire shall be satisfied that the evidence submitted is of a type on which he or she can rely, that the hearing is in all respects a fair one, and that all facts that are reasonably obtainable and necessary to a fair decision are brought before the umpire.

(D) Each party may submit a brief written summary of the issues raised at the hearing and arguments supporting its position within five (5) working days of the hearing, unless the Parties mutually agree to an extension of time. There will be no extension to the Parties after the written briefs are submitted. The umpire shall render his/her decision within five (5) working days after receiving the brief. The umpire shall provide the Parties a brief written statement of the reasons supporting the decision.

(E) The umpire's decision shall apply only to the instant grievance, which shall be settled thereby. The Company and the Union agree to abide by the decision. The decision shall not constitute a precedent for other cases or grievances and may not be cited or used as a precedent in other arbitration matters between the Parties unless the decision or a modification thereof is adopted by the written concurrence of the representatives of each party at the third step of the grievance procedure.

(F) In emergency situations only, the time limits in (A) and (D) above may be extended by agreement of the Parties or at the umpire's request. Such extensions shall not circumvent the purpose of this procedure.

(G) In any grievance arbitrated under the provisions of this Section, the Company shall under no circumstances be liable for backpay for more than six (6) months (plus any time that the processing of the grievance or arbitration was delayed at the specific request of the Company) after the date of the disciplinary action. Delays requested by the Union in which the Company concurs shall not be included in such additional time. Any backpay awarded shall be reduced or offset by all interim earned income, unemployment compensation, termination pay (or similar allowances paid pursuant to any provisions of an applicable agreement or established plan), or disability or pension benefits.

(H) The umpire shall have no authority to add to, subtract from, or modify any provisions of this Agreement.

49

---

*(partial cut-off text in left margin column)*

...tual employee,
...ity, contract in-
...ose which are
...action shall be

...tion procedure
...quest for arbi-
...cion which are
...tion: Arbitration
... days after the
...peded arbitra-
...when signed by
...ed, the full arbi-
...ve shall be fol-

...ral and binding,
...Parties. Each
...rent unless this/
...om either party
...rmination by a
...ide his/her ser-
...successor um-
...ill be assigned

...ty (30) working
...r passed to the
...he case within
...the umpire who

...ollows;

...the submission
...he umpire shall

...e umpire a writ-

**Expedited Arbitration**

13.25 Any grievances involving the suspension of an individual employee except those which also involve an issue of arbitrability, contract interpretation, or work stoppage (strike) activity and those which are also the subject of an administrative charge or court action shall be submitted to arbitration under this expedited arbitration procedure within fifteen (15) calendar days after the filing of a request for arbitration. In all other grievances involving disciplinary action which are specifically subject to arbitration, as specified in Section, Arbitration above, both Parties may, within fifteen (15) calendar days after the filing of the request for arbitration, elect to use this expedited arbitration procedure. The election shall be in writing and, when signed by authorized representatives of the Parties, shall be irrevocable. If no such election is made within the foregoing time period, the full arbitration procedure specified in Section, Arbitration above shall be followed.

13.26 As soon as possible after this Agreement becomes final and binding, a panel of ten (10) umpires shall be selected by the Parties. Each umpire shall serve until the termination of this Agreement unless his/her services are terminated earlier by written notice from either party to the other. The umpire shall be notified of such termination by a joint letter from the Parties. The umpire shall conclude his/her services by settling any grievance previously heard. A successor umpire shall be selected by the Parties. Umpires shall be assigned cases in rotating order designated by the Parties.

13.27 If an umpire is not available for a hearing within thirty (30) working days after receiving an assignment, the case will be passed to the next umpire in the rotation. If no umpire can hear the case within thirty (30) working days, the case will be assigned to the umpire who can hear the case on the earliest date.

13.28 The procedure for expedited arbitration shall be as follows:

(A) The Parties shall notify the umpire in writing of the submission within the time specified in paragraph 13.25. The umpire shall notify the Parties in writing of the hearing date.

(B) Prior to the hearing, the Parties may submit to the umpire a written stipulation of all facts not in dispute.

(C) The hearing shall be informal without formal rules of evidence and without a transcript. However, the umpire shall be satisfied that the evidence submitted is of a type on which he or she can rely, that the hearing is in all respects a fair one, and that all facts that are reasonably obtainable and necessary to a fair decision are brought before the umpire.

(D) Each party may submit a brief written summary of the issues raised at the hearing and arguments supporting its position within five (5) working days of the hearing, unless the Parties mutually agree to an extension of time. There will be no extension to the Parties after the written briefs are submitted. The umpire shall render his/her decision within five (5) working days after receiving the brief. The umpire shall provide the Parties a brief written statement of the reasons supporting the decision.

(E) The umpire's decision shall apply only to the instant grievance, which shall be settled thereby. The Company and the Union agree to abide by the decision. The decision shall not constitute a precedent for other cases or grievances and may not be cited or used as a precedent in other arbitration matters between the Parties unless the decision or a modification thereof is adopted by the written concurrence of the representatives of each party at the third step of the grievance procedure.

(F) In emergency situations only, the time limits in (A) and (D) above may be extended by agreement of the Parties or at the umpire's request. Such extensions shall not circumvent the purpose of this procedure.

(G) In any grievance arbitrated under the provisions of this Section, the Company shall under no circumstances be liable for backpay for more than six (6) months (plus any time that the processing of the grievance or arbitration was delayed at the specific request of the Company) after the date of the disciplinary action. Delays requested by the Union in which the Company concurs shall not be included in such additional time. Any backpay awarded shall be reduced or offset by all interim earned income, unemployment compensation, termination pay (or similar allowances paid pursuant to any provisions of an applicable agreement or established plan), or disability or pension benefits.

(H) The umpire shall have no authority to add to, subtract from, or modify any provisions of this Agreement.

48

49